VENCOR INC., d/b/a Vencor Kentucky, Inc., d/b/a/ Vencor Hospital—Louisville and d/b/a Vencor Hospital—Chattanooga, Plaintiff,

v.

STANDARD LIFE AND ACCIDENT INSURANCE COMPANY, Defendant.

Civil Action No. 3:98–CV–20–H.

United States District Court, W.D. Kentucky, at Louisville.

Sept. 10, 1999.

K. Gregory Haynes, Wyatt, Tarrant & Combs, Louisville, KY, Bradley L. Kelly, Laura J. Oberbroeckling, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Washington, DC, for plaintiffs.

Raymond G. Smith, Boehl, Stopher & Graves, Louisville, KY, Richard J. Kilmartin, Samuel G. Ware, Knight, Boland & Riordan, San Francisco, CA, for defendant.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Plaintiff, Vencor, Inc. ("Vencor") operates long-term, intensive care hospitals, including one in Louisville, Kentucky and one in Chattanooga, Tennessee. Defendant, Standard Life and Accident Insurance Company ("Standard Life") issued Medicare supplement insurance policies for two insureds, Mac Weaks and Mildred Hollow, who received health care services at the Vencor hospitals in Louisville and Chattanooga. Vencor was entitled to and did receive Medicare supplement insurance benefits from Standard Life for those insureds. The parties dispute the amount due under the insurance policies. Vencor contends that Standard Life owes the full amount of Vencor's standard rates. Standard Life contends its insurance policy only obligates it to pay the Medicare per diem rates. Vencor filed claims against Standard Life for breach of contract, subrogation, and promissory estoppel.

Each party has moved for summary judgment on a different issue. Standard

Life moved for summary judgment on Vencor's breach of contract claim. Vencor requests a judgment that it may charge patients who are no longer receiving Medicare Part A benefits its standard and customary charges. The Court addresses the breach of contract claim first.[1] To resolve this issue, the Court must first understand something of the Medicare program and the insurance policies, such as Standard Life's, designed to supplement it.

## I.

The parties agree on the general provisions of the Medicare program which apply to this case, and they do not dispute any essential facts. Part A of Medicare covers hospitalization expenses. Under Part A, Medicare pays benefits for ninety days for each "spell of illness." A new ninety day benefit period commences whenever a period of sixty days interrupts the beneficiary's hospitalization. In addition to the ninety days of coverage, Medicare entitles beneficiaries to sixty nonrenewable, lifetime reserve days. Thus, for a single illness and hospitalization, a beneficiary could receive 150 days of Medicare benefits under Part A, assuming the beneficiary previously had not used up any lifetime reserve days.

Vencor hospitals serve patients needing long-term health care and qualifies to accept assignment of Medicare Part A benefits. The parties agree that Medicare pays Vencor under the Reasonable Cost Reimbursement System (RCRS), 42 C.F.R. Part 413, §§ 413.1 *et seq.* The RCRS determines a per diem rate by dividing the hospital's total costs of caring for Medicare patients by the number of Medicare patient days. Medicare pays only a portion of the per diem rate. The beneficiary or the supplemental insurer pays the deductible. Similarly, during the sixty-day lifetime reserve period, Medicare pays only a portion of the per diem rate. The beneficiary or insurer is responsible for the co-insurance amount. The per diem rate is the same; the deductible or co-insurance amount changes depending on which coverage period applies to the beneficiary. 42 U.S.C. § 1395e.[2]

Today, Medicare supplemental insurance policies must meet minimum requirements established by law. 42 U.S.C. § 1395ss. Certification of policies meeting the minimum standards was voluntary, not mandatory, when the policies in this case were issued. Under federal law, states are permitted to adopt laws also requiring standardized policies that are equal to or more stringent than the minimum requirements of the federal standards.[3]

Standard Life issued Medicare Supplement Policy, No. SW 247407, to Mac Weaks on January 25, 1991 ("Weaks Policy") and issued Medicare Supplement, Policy No. 395927, to Mildred Hollow on June 28, 1991 ("Hollow Policy"). Each insured entered Vencor hospitals and while there exhausted their Medicare Part A benefits. Mr. Weaks, a Medicare eligible beneficiary, was hospitalized at Vencor's Louisville facility from March 21, 1996 until his death, August 6, 1996. While Mr. Weaks was entitled to Medicare benefits, Medicare allowed Vencor to charge $800 per day under Medicare Part A for treatment

---

1. After reviewing the summary judgment memoranda of the parties, the Court served each with a "draft opinion" and, thereafter, asked the parties to appear for oral argument. The parties presented excellent responses to the draft opinion, helping the Court better understand and appreciate the underlying issues. As a consequence, the Court completely reviewed its approach to the draft. In the end and even after thorough reconsideration of the various arguments, this Memorandum Opinion retains most of the key decisional elements of the draft.

2. As the Court will discuss later, no one disputes that the Standard Life policies do pay the deductible or coinsurance amount not paid by Medicare.

3. Tennessee adopted such regulations, effective January 10, 1991. *See* Tenn.Comp.R. & Regs. tit. 0780, ch. 1–58–.05 (1991). Those regulations would apply to the policies in issue here, but they do not necessarily affect the Court's analysis. The regulations have since been revised.

of Medicare eligible patients such as Mr. Weaks. Medicare paid Vencor a portion of that amount—about $544 on average; Standard Life paid the remaining co-insurance charges—about $256 on average—pursuant to the Weaks Policy.[4] On June 15, 1996, Mr. Weaks' Medicare Part A benefits ended. Ms. Hollow, likewise a Medicare eligible beneficiary, was hospitalized at a Vencor hospital in Chattanooga from January 3, 1996 until September 18, 1996. Medicare allowed Vencor to charge $900 for Ms. Hollow's treatment. Medicare paid a portion of that amount—about $590 on average; Standard Life paid her remaining co-insurance charges—about $310 on average.[5] Her benefits were exhausted on March 31, 1996.

In each case, after Medicare Part A benefits ended, Standard Life paid Vencor the total amount that Medicare had allowed Vencor to charge under Part A benefits, that is the full $800 per day for Mr. Weaks' treatment and the full $900 per day for Ms. Hollow's treatment until each passed away. Vencor insists that it is entitled to payment on the basis of its "regular rates." In these two instances, the regular rates are between two and three times higher than the Medicare allowed rates. The Court must decide which amount Standard Life has agreed to pay under the Weaks and Hollow policies.

To do so, the Court must turn first to the policies themselves.

## II.

The Court has the unenviable task of considering these contracts while central parties, the insureds (or their estates), are absent. While Vencor claims a right of subrogation, and thereby claims to be representing the interests of insureds, its position is more accurately described as a third-party beneficiary of the insurance contracts. Vencor's interest in the outcome of the case is not quite the same as the insureds. In one important aspect, Vencor's interest is absolutely contrary to the insureds: Vencor wants the right to charge more than twice the Medicare rate after Medicare has been exhausted regardless of who is paying the bill. In spite of this difficulty, the Court hopes to reach a fair conclusion through straightforward application of Tennessee contract law.

Under Tennessee law, "[a]n ambiguity does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions." *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Systems, Inc.*, 884 S.W.2d 458, 462 (Tenn.Ct.App.1994) (citing *Oman Constr. Co. v. Tennessee Valley Authority*, 486 F.Supp. 375, 382 (M.D.Tenn.

4. Vencor submitted with its pleadings documents that show Vencor's charges, Medicare reimbursements, and co-insurance receipts for Mac Weaks. See Tab A, Bibelhauser Aff. The Court totaled Vencor's charges, Medicare reimbursements, and co-insurance or deductibles received during Weaks' Medicare Part A coverage, which can be summarized as follows:

| | |
|---|---|
| Vencor's Charges: | $177,673.96 |
| Medicare reimbursement | $ 55,234.00 |
| Co-insurance | $ 25,566.00 |

From these figures, it appears that Medicare paid approximately 68.4% of the per diem amount and Standard Life paid approximately 31.6% of the per diem through co-insurance or deductibles. (The Court notes that although both parties agree in their pleadings that the per diem rate set by Medicare for Mac Weaks was $900, the documentation submitted by Vencor indicates a per diem rate of $1000 for all times he was covered by Medi-

care except the for the period 6/1/96 through 6/11/96, at which time the per diem rate was $800).

5. Vencor submitted with its pleadings documents that show Vencor's charges, Medicare reimbursements, and co-insurance receipts for Mildred Hollow. See Tab A, Jones Aff. The Court totaled Vencor's charges, Medicare reimbursements, and co-insurance or deductibles received during Hollow's Medicare Part A coverage, which can be summarized as follows:

| | |
|---|---|
| Vencor's Charges: | $205,784.39 |
| Medicare reimbursement | $ 52,216.00 |
| Co-insurance | $ 27,884.00 |

From these figures, it appears that Medicare paid approximately 65.2% of the per diem amount and Standard Life paid approximately 34.8% of the per diem through co-insurance or deductibles.

1979)). Furthermore, "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists." *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn.1975). If a court finds that the contract is ambiguous, a court's duty is to "ascertain the intention of the contracting parties, understand what they meant by the contract, and give effect to such understanding and meaning." *Commerce Street Company v. Goodyear Tire and Rubber Company*, 31 Tenn.App. 314, 215 S.W.2d 4, 10 (1948).

■ Interpretation of an unambiguous contract is a question of law for the court. *Hamblen County v. City of Morristown*, 656 S.W.2d 331 (Tenn.1983). In assessing the contract for ambiguities, the Court should consider the whole contract. *Williamson County Broadcasting Co. Inc., v. Intermedia Partners*, 987 S.W.2d 550, 552 (Tenn.App.Ct.1998). The *Hamblen* court also noted that even when the agreement is unambiguous, one may " 'consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining' " the contract's meaning. *Id.* at 334, quoting Restatement of Contracts § 235(d) and Comment. *See also Stovall v. Dattel*, 619 S.W.2d 125, 127 (Tenn.App.Ct.1981) (court to consider situation of the parties, nature of the business in which they are engaged, and contract's subject matter).

Tennessee courts have also noted that in considering any contract, including an insurance contract, "[l]anguage . . . which happens to be technical or complex to the layman, does not render it ambiguous, and where there is no ambiguity it is the duty of the court to apply to the words used their usual, natural and ordinary meaning.

The court cannot, under the guise of construction, make a new and different contract for the parties." *Blaylock & Brown Construction, Inc. v. AIU Insurance Co.*, 796 S.W.2d 146, 149 (Tenn.App.1990).

■ The pertinent portions of the Weaks and Hollow policies are identical,[6] and state as follows:

SECTION TWO—DEFINITIONS
***
" 'Medicare Eligible Expense' means health care expense of the kind covered by Medicare to the extent recognized as reasonable by Medicare."
***

SECTION THREE—BENEFITS
PART A BENEFIT. Standard Life will pay a benefit to supplement Part A of Medicare when you incur expenses as a result of injury or sickness. The benefit for each benefit period will be equal to the **Medicare eligible expense** you incur for a) the Part A inpatient hospital deductible if the application shows Plan 1 or Plan 2 was selected; b) the Part A hospital coinsurance amounts beginning with your 61st day of hospital confinement; and c) the skilled nursing facility coinsurance amounts. The benefit will also be equal to the Medicare eligible expense you incur for the Part A blood deductible.

If you are confined to a hospital for at least 90 days in a benefit period and have used all your lifetime reserve days, Standard Life will pay a benefit for each day of your continued confinement, subject to a lifetime maximum of 365 days. **The daily benefit will be equal to 100% of the *Medicare eligible expenses* you incur.**

If you are not covered under Part A of Medicare, Standard Life will pay a benefit as if you were covered under Part A of Medicare.

---

**6.** Plaintiff contended that Exhibit 4 attached to its Memorandum in Support for its motion for summary judgment was a copy of Mac Weaks' policy. Inspection of that document, however, indicates that Exhibit 4 was actually a Medicare Supplement policy issued to Eva Weaks on September 25, 1992.

*See* Def.Mem. in Support of Motion for Summary Judgment, *Weaks Policy,* Tab 1, Exhibit A; *Hollow Policy,* Tab 1, Exhibit B (emphasis added). The parties dispute the clarity of the contract, particularly the emphasized sections.

Standard Life admits that upon exhaustion of the insured's Medicare benefits, Standard Life must pay 100% of the insured's "Medicare eligible expenses". Therefore, the breach of contract claim turns on the meaning of that phrase. Standard Life argues that the term means all the expenses covered by Medicare before the patient exhausts Medicare benefits, paid at the per diem rate. The per diem rate is the amount Medicare would have paid the provider plus any deductible or co-insurance Standard Life would have paid prior to exhaustion of Medicare. In contrast, Vencor claims the term "Medicare eligible expenses" is ambiguous and should be construed to include all care rendered by the provider which is reasonable and necessary under Medicare's guidelines. According to Vencor's analysis, the term limits the type and level of services provided and requires Standard Life to pay for those services regardless of cost. Vencor argues that the policies do not limit Standard Life's liability to the per diem amount because they never stipulate any cap on the amount Standard Life will pay for covered care.

Viewed in isolation, Vencor's analysis offers a plausible interpretation of "Medicare eligible expenses". The policies define "Medicare eligible expenses" as any "health care expense of the kind covered by Medicare to the extent recognized as reasonable by Medicare". This definition could indeed refer to the type and level of care covered under the circumstances without any other limitation on the amount Standard Life contracted to pay.

Vencor's interpretation becomes implausible, however, when the contract is considered as a whole. Both policies use the term "Medicare eligible expenses" in the "Part A Benefit" section to refer to the amount of money Standard Life will pay.

In the first paragraph, the policy states it covers

"Medicare eligible expenses you incur for a) the Part A inpatient hospital deductible if the application shows Plan 1 or Plan 2 was selected; b) the Part A hospital coinsurance amounts beginning with your 61st day of hospital confinement."

In this section "Medicare eligible expenses" could mean nothing other than the per diem amount. Medicare Part A provides that Medicare pays either the per diem amount less a deductible or the per diem amount less a co-insurance amount, depending on which part of the Medicare coverage days are in issue. 42 U.S.C. § 1395e. The deductible or coinsurance is taken from the per diem amount, not from Vencor's "regular" charge. The references make little sense with any other interpretation.

In the next paragraph, the term "Medicare Eligible Expenses" appears again, describing Standard Life's obligations after Medicare benefits are exhausted. This is the paragraph at issue in the breach of contract claim. The term "Medicare eligible expenses" used here must also limit the amount Standard Life will pay as well as the type of care. Otherwise the meaning of "Medicare eligible expenses" would alter from one paragraph to the next.

Reading the contract as a whole clarifies the definition of a "Medicare eligible expenses" and, in the Court's view, effectively eliminates Vencor's analysis as a fair interpretation of the term. Given the whole contract, the first prong of the definition, "of the kind covered by Medicare" must refer to an expense for the type or quantity of care medically necessary under the circumstances. The second prong of the definition, "to the extent recognized as reasonable by Medicare", must refer to charges that are reasonable for the medically necessary care.

While the Court does not need to look beyond the language of the contract itself, the structure of Medicare reimbursement generally also supports Standard Life's in-

terpretation. In all cases, Medicare determines both the reasonable cost and quantity of care under the circumstances. An expense is not eligible for reimbursement by Medicare unless Medicare deems it to be medically necessary and reasonably priced.

Further, the statutory and regulatory provisions governing Medicare and Medicare supplemental insurance accord with Standard Life's interpretation.[7] For instance, 42 U.S.C. § 1395y states that no payments will be made under Part A of Medicare for items or services which "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A) (West 1990). This statute corresponds to the first prong of the policies' definition of "Medicare eligible expenses". Expenses must be medically reasonable and necessary to be the "kind of expense covered by Medicare".[8]

Similarly, the regulations governing the Reasonable Cost Reimbursement System (RCRS), 42 C.F.R. part 413, provide support for the Court's conclusion that the "recognized as reasonable" portion of the "Medicare eligible expenses" definition refers to costs, not procedures or quality of care. The only section of the Medicare regulations where the phrase "recognized as reasonable" appears is in these RCRS provisions, and invariably, it is used in reference to recognizing *costs* as reasonable. *See, e.g.*, 42 C.F.R. § 413.30. Furthermore, in determining reasonable costs, the Health Care Financing Administration is authorized to set limits on a per diem basis:

> (2) General principle. Reimbursable provider costs may not exceed the costs estimated by HCFA to be necessary for the efficient delivery of needed health services. HCFA may establish estimated cost limits for direct or indirect overall costs or for costs of specific items or services or groups of items or services. These limits will be imposed prospectively and may be calculated on a per beneficiary, per admission, per discharge, *per diem*, per visit, or other basis.

42 C.F.R. § 413.30(a)(2). In the context of health care policy, recognizing costs as reasonable and limiting costs are two sides of the same coin. HCFA limits costs to the amount it recognizes as reasonable. When HCFA chooses to implement the RCRS through per diem rates, they are indicating that the per diem rate is what they "recognize as reasonable." [9]

Vencor argues that the ambiguities of the policy language are compounded by the "Outline of Coverage" provided by Standard Life to its insureds. Vencor says that a fact dispute exists as to whether the Outline is part of the contract. The Court disagrees. The Outline itself clearly states that the policy governs; moreover, Tennessee law requires such a statement. *See* Tenn.Code Ann. § 56–7–1404(a)(4). Thus, while the Outline may contribute to some confusion on Standard Life's obligations, the contract speaks for itself.[10]

---

**7.** The Court only considered statutes and regulations in effect when Standard Life issued the policies. 42 U.S.C. § 1395y(a)(1)(A) remains in effect and unchanged today.

**8.** Vencor is right—a semi-private room may be "reasonable" in one circumstance and not in another. However, Vencor's assertion that in all circumstances it would be the *"kind* of expense covered by Medicare" is simply not true. Section 1395y(a)(1)(A) would preclude it from coverage if it were not medically reasonable and necessary.

**9.** Likewise, when Medicare sets the DRG payment rates under the PPS system, they are recognizing what charges are reasonable in the short-term, acute-care context.

**10.** This Court is not the first to consider these issues. Both sides cite numerous cases on similar or even identical contract interpretation questions. Vencor cites a number of cases which seem to be distinguishable. For example, the court in *Vencor Hospital South, Inc. v. National States Insurance Co.*, No. 94–894–Civ.T–21E (M.D.Fla. June 22, 1995), 1995 U.S. Dist. LEXIS 21544, *aff'd per curium*, 120 F.3d 274 (11th Cir.1997) found a significantly different contract provision ambiguous and construed it against the insurer. (The provision interpreted stated that after

The foregoing analysis convinces the Court that the Weaks and Hollow policies limit Standard Life's obligation to pay the Medicare per diem rate to Vencor once the insureds' Medicare benefits were exhausted.

### III.

The Court now turns to Vencor's motion for summary judgment. Vencor asks the Court to find as a matter at law that it is free to charge patients its standard and customary rates for care and services once the patients have exhausted their Medicare Part A benefits. Several other courts around the country have addressed this question. Most of the decisions rely on supplemental insurance regulations to find that providers cannot charge more than the Medicare rate. This Court questions the premise that supplemental insurance regulations create a legally binding limit on the amount that health care providers may charge. After all, the regulations are designed to guide insurers, not providers. While Congress and state legislatures have provided detailed regulation of most as-

pects of Medicare, they do not yet seem to have clearly denied health care providers the right to charge whatever rates the providers choose after Medicare is exhausted. Whether such an omission, if that is the case, was intentional and meaningful or merely inadvertent is unclear.

Allowing health care providers to charge any amount would create an apparent inconsistency. Such a ruling would expose many elderly or their estates to liability for the amount that the provider's rate exceeded the Medicare rate. Such a result runs counter to the whole purpose of supplemental Medicare insurance regulations. The goal of Medigap policies is to prevent the elderly from facing uncertain and possibly cost prohibitive medical expenses. If providers can charge any amount after the elderly exhaust Medicare benefits and supplemental insurers are not liable, this goal is thwarted and the implicit promise of Medigap policy is made illusory.

Legislation requiring Medigap insurers to write policies covering any amount charged by providers for eligible care could solve this problem. However, nei-

---

exhaustion of Medicare Part A benefits, the insurer "will pay all further expenses incurred for hospital confinement that would have been covered by Medicare Part A, up to a lifetime maximum of another 365 days.") Vencor also cites *Vencor Hospitals, d/b/a Vencor Hospital v. Blue Cross Blue Shield of Rhode Island,* 169 F.3d 677 (11th Cir.1999), which vacated a district court's ruling that the "Medigap" policy was unambiguous. The appellate court did not interpret the contract, but instead remanded the case for a finding by the district court on whether the "Outline of Coverage" was part of the contract. If so, the appellate court reasoned, the contract would be ambiguous. In *Vencor Hospitals, California, Inc., d/b/a/ Vencor Hospital, Orange County v. Harold Millar* (and related cross-action) Case No. 761472 (Cal.Sup.Ct., Dec. 30, 1997) (appeal pending), the court did not interpret the contract at issue, but instead interpreted the state law definition of "Medicare Eligible Expenses" which was slightly but significantly different than the wording in the present case. (Under California law, the definition of "Medicare eligible expense" is " 'expenses of the kind covered by Medicare to the extent recognized as reasonable and medically necessary by Medicare.' " *Vencor*

*v. Millar—Rulings of Law,* Tab 8, Vencor's Motion for Summary Judgment). None of these cases assists in the interpretation of the Standard Life policies at issue in this case.

The cases cited by Standard Life seem more straightforward and more analogous to this case. Two courts found Standard Life Medigap policies identical to the Weaks and Hollow policies to be unambiguous. *Vencor Hospital, Inc. v. Standard Life and Accident Insurance Company,* Civil No. A–97–CA–606–JN (W.D.Tex., October 22, 1998) (appeal pending); *Vencor Hospitals, Inc. v. Standard Life and Accident Insurance Co.,* Case No. 97–1976–CIV–T–26E (M.D.Fla. September 22, 1998) (motion for reconsideration pending). The court in a third case, *Vencor Inc. v. National States Insurance Co.,* CIV 97–2350–PHX ROS (D.Ariz. July 9, 1999) found the contract arguably ambiguous. Under Arizona law, however, this did not require the court to construe it against the insurer. Instead, after reviewing the legislative history of Medicare, Arizona law, and the Outline of Coverage, the court determined that public policy called for an interpretation that limited the insurer's obligation to the per diem amount.

ther Congress nor the Tennessee state legislature has chosen to mandate this. One reason may be that to do so would cause the cost of supplemental insurance policies to increase dramatically, likely pricing many elderly out of the supplemental insurance market altogether. This result also appears at odds with the purpose and goals of the current Medicare structure, to ensure that the elderly have access to necessary health care.

The Court is confronted with a complex legislative scheme involving many delicate policy choices. Though complex, the legislative scheme may not resolve every important question. For the time being, the Court finds it unnecessary to inquire whether there is sufficiently strong evidence of legislative intent to fairly resolve these problems. To do so might require the Court to adopt its own policy and write its own amendments. No doubt a legislature pronouncement would provide the most appropriate resolution of how much providers may charge after the elderly exhaust Medicare benefits.

Whether Vencor can charge its customary rates is not an issue requiring resolution in the breach of contract claim. It seems unlikely to be relevant in the context of Vencor's promissory estoppel claim either. If the only representation made by Standard Life was submission of the insurance policy, then Vencor will lose on the promissory estoppel claim. If Standard Life made some other representation to Vencor, it is conceivable that Vencor may have a viable claim, but Vencor must establish that an injustice would result from receiving its Medicare rate. *See Amacher v. Brown–Forman Corporation,* 826 S.W.2d 480 (Tenn.App.1991) (promissory estoppel is only appropriate when necessary to avoid injustice). The record on the promissory estoppel claim appears wholly undeveloped at this time. Until it is, the Court will remand Vencor's motion for summary judgment.

The Court will enter an order consistent with this Memorandum.

## ORDER

The Court having considered the cross-motions for summary judgment and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion for summary judgment on Plaintiff's claim for breach of contract is SUSTAINED and Plaintiff's breach of contract claim is DISMISSED with prejudice.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment is REMANDED at this time.

IT IS FURTHER ORDERED that the parties shall jointly advise the Court regarding a proposed litigation plan for the remaining promissory estoppel claim.