**VENCOR HOSPITALS SOUTH, INC., d/b/a Vencor Hospital—Fort Lauderdale, Plaintiff,**

v.

**BLUE CROSS AND BLUE SHIELD OF RHODE ISLAND, Defendant.**

No. 94–6881–CIV.

United States District Court, S.D. Florida.

March 6, 2000.

Bradley L. Kelly, Laura J. Oberbroeckling, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Washington, DC, Richard Benjamin Wilkes, Gardner, Wilkes, Shaheen & Candelora, Tampa, FL, for plaintiff.

Eric Christu, Elk, Bankier, Palmer & Christu, Boca Raton, FL, John E. Bulman, Little, Bulman, & Whitney, P.C., Providence, RI, for defendant.

## ORDER

GONZALEZ, District Judge.

**THIS CAUSE** has come before the Court upon the Order of Remand from the Eleventh Circuit Court of Appeals, filed March 8, 1999. The parties have fully briefed the issues, and the Court finds that the majority of the issues can be decided without a hearing.

## I. BACKGROUND

The facts of this case are reported in the opinion of the Court of Appeals, *Vencor Hospitals v. Blue Cross Blue Shield of Rhode Island*, 169 F.3d 677 (11th Cir.1999) (hereinafter *BCBS II*), and thus need not be fully recounted here.

In short, Vencor is a provider of long-term inpatient care. Blue Cross and Blue Shield ("BCBS") issues Medicare supplement insurance policies, otherwise known as Medigap policies. While two holders of BCBS Medigap policies (Esposito and Butler) were patients of Vencor their Medicare expired and they had to rely on Medigap policies to cover their hospitalization.

BCBS paid Vencor (or the insured directly) the amount that Medicare would have paid for the services provided. Vencor later filed suit alleging breach of contract, subrogation, and promissory estoppel. Vencor claims in its own right that it is entitled to collect its standard rates from BCBS. Vencor also claims that Esposito and Butler have causes of action against BCBS that are subrogated to Vencor.

The policy language at issue states:

Upon exhaustion of all Medicare hospital inpatient coverage including the above lifetime reserve days, we will cover up to ninety percent (90%) of all Medicare Part A Eligible Expenses for hospitalization not covered by Medicare subject to a lifetime maximum benefit of an additional 365 days.

(BCBS Individual Plan 65 Subscriber Agreement, § 3.1) (hereinafter "BCBS Policy"). The term "Medicare Eligible Expenses" is defined as "the health care expenses covered under Medicare which Medicare has determined are reasonable and medically necessary." (BCBS Policy,

§ 1.1). The policy also contains a merger clause that states, "The entire contract consists of the application, this agreement and any attached amendments." (BCBS Policy, § 2.1).

On June 11, 1996, the Court entered Final Judgment in favor of BCBS after the Court granted BCBS's Motion for Summary Judgment. The summary judgment order found that the policy unambiguously stated that BCBS was liable only for the amount that Medicare would have allowed. *Vencor Hospitals South, Inc. v. Blue Cross Blue Shield of Rhode Island*, 929 F.Supp. 420 (S.D.Fla.1996) (hereinafter *BCBS I*).

The Eleventh Circuit vacated and remanded for further proceedings. The Court of Appeals found that an issue of fact existed as to whether Vencor is entitled to payment based on its ordinary charges.[1] *BCBS II*, 169 F.3d at 680. The Court stated that it was uncertain as to exactly which documents comprise the insurance contract and remanded the case to this Court with instructions to consider whether the state regulatory scheme requires that an Outline of Coverage and a promotional brochure be considered part of the contract.[2] *Id.* at 681. The Court of Appeals also instructed this Court to consider the issues of accord and satisfaction of the Esposito claim and Vencor's assertion of a theory of promissory estoppel. *Id.* at 682.

## II. DISCUSSION

The Court of Appeals delineated four specific and distinct issues for this Court to consider. Those issues are as follows:

(A) Whether "health care expenses" in the definition of "Medicare Eligible Expenses" refers exclusively to types of expenses (forms of treatment)—Vencor

---

1. Contrary to the assertion of Vencor, the Court of Appeals did not hold that Vencor may in fact collect its full standard charges, as opposed to the discounted Medicare amount.

2. Again, in its brief, Vencor misstates the holding of the Court of Appeals when it omits

a very important "if" and quotes the Eleventh Circuit opinion for the proposition that "the clear legislative purpose of 'the state regulatory scheme requires the Outline of Coverage to be read into the contract' of insurance." (Vencor Brief at 5 (quoting *BCBS II*, 169 F.3d at 681 n. 9)).

argument—or also includes amounts of expenses—BCBS argument.

An integral part of this question, the Court of Appeals found, is whether the insurance policy is the only document comprising the contract. The Court of Appeals directed this Court to consider whether under the state regulatory scheme the Outline of Coverage must be read into the contract. Also, the Court of Appeals instructed this Court to consider what significance, if any, should be accorded a promotional brochure in interpreting the policy? *BCBS II,* 169 F.3d at 681.

(B) If the BCBS interpretation is correct, what amount is owed to Vencor? In other words, what amount would Medicare have paid? *BCBS II,* 169 F.3d at 681.

(C) Was there accord and satisfaction of the Esposito claim? The Court of Appeals found that there was no accord and satisfaction on the Butler claim, but that there exist genuine issues of material fact as to the Esposito claim. *BCBS II,* 169 F.3d at 682.

(D) Notwithstanding all of the above, is Vencor entitled relief under a theory of promissory estoppel? The Court of Appeals found that this issue was not ripe for review until the breach of contract claim is decided. *BCBS II,* 169 F.3d at 682 n. 14.

The Court will address each of these issues in turn.

## A. THE CONTRACT

1. *Whether the Outline of Coverage and Promotional Brochure are Part of the Insurance Contract*

■ The Court of Appeals' primary concern seemed to be whether the Florida or Rhode Island state regulatory scheme required that the Outline of Coverage be considered part of the contract. *BCBS II,* 169 F.3d at 681. If the Outline is considered part of the contract, the Circuit Court

held, then the contract is ambiguous and, in accordance with Florida law, that ambiguity must be resolved in favor of Vencor.[3] *Id.*

The Court of Appeals found that one reason to consider the Outline as part of the contract is that state law required that BCBS provide such an outline. *Id.* (citing Fla.Admin.Code Ann. r. 41–51.006(3) (1990)). The Court of Appeals found that the presumable intent of the legislature was to provide the insured with a document setting forth the insured's rights with more clarity than is provided in the policy, and thus "mak[e] it more difficult for the insurance company to defraud purchasers regarding the scope of coverage." *Id.* The Court of Appeals further found that the legislature's intent may be frustrated if the Outline were not considered part of the contract. *Id.*

The Court of Appeals' concerns are allayed by the regulation itself and the mandatory language of the Outline. Florida Department of Insurance[4] Rule 4–51.006(3)(c) prescribes a form for the Outline of Coverage and mandates that the Outline be in that form. The very first point of the form outline reads as follows:

1. Read your policy carefully—This outline of coverage provides a brief description of the important features of your policy. *This is not the insurance contract,* and *only the actual policy provisions will control.* The policy itself sets forth in detail the rights and obligation of both you and your insurance company. It is, therefore, important that you READ YOUR POLICY CAREFULLY!

Fla.Admin.Code Ann. r. 41–51.006 (1990) (emphasis added; capitals in original). While Vencor argues that this rule requires that the Outline of Coverage be considered part of the insurance contract,

---

3. The part of the Outline of Coverage to which Vencor and the Eleventh Circuit referred is laid out as a table therein. The relevant portion of the table is reproduced as Appendix "A" hereto.

4. The Florida Legislature delegated to the Department of Insurance the responsibility for adopting rules establishing standards for Medicare supplement policies. § 627.674(2), Fla.Stat.Ann. (1987).

the plain language of this very rule expressly rejects such a contention.[5]

In addition to the Department of Insurance regulations, Florida statutory law mandates the same result. Section 627.642 of Florida Statutes prescribes that all health insurance policies shall be accompanied by an outline of coverage. § 627.642(1), Fla.Stat.Ann. (1996). The statute goes on to say though that such outline of coverage shall contain, "A statement that the outline contains a summary only of the details of the policy ... and that the issued policy should be referred to for the actual contractual governing provisions." § 627.642(2)(e), Fla.Stat.Ann.

The Court finds that it need not look into the legislative history to determine whether the legislature intended that the Outline be considered part of the contract. The intent is evident from the face of the Department of Insurance regulation and the health insurance statute. Where the language of a statute or regulation is clear, there is no occasion to look to the legislative history behind that statute or regulation. *See United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961) (where statutory provisions are "clear and unequivocal on their face," there is "no need to resort to the legislative history of the Act").

It is more than apparent that it was the intent of the regulatory scheme that the policy itself govern and that the Outline of Coverage not be considered part of the insurance contract. Had the Legislature intended that the Outline be considered a part of the insurance contract, the Legislature and the Department of Insurance surely would not have mandated language to the contrary.

In addition, the Outline of Coverage itself makes clear that it is not to be construed as part of the insurance contract. As required by law, BCBS's Outline of Coverage for Plan 65 opens with language

identical to that in the Rule 4–51.006 form. Thus the Outline makes plain that if an insured has any doubts as to the coverage, the insured should look to the policy itself, not to the Outline. It would be nonsensical to consider the Outline to be a part of the contract when on its face and in a very conspicuous manner it declares that it is not.

The Court acknowledges that the relevant portion of the Outline of Coverage, *see* Appendix A, may be a bit confusing. For the most part, it is quite accurate. As it states, during the period when Medicare coverage is in effect, BCBS pays the inpatient deductible required by Medicare during the first sixty days. For days 61–90, BCBS pays the copayment required by Medicare. For days 91–150, BCBS pays the copayment required by Medicare for the lifetime reserve days. For these benefits, the third column (the "You Pay" column) is accurate in stating that the insured pays $0.00. However, it is the last statement which deals with payments upon exhaustion of lifetime reserve days that may create some confusion. This statement itself makes clear that upon exhaustion of lifetime reserve, BCBS pays 90% of Medicare Part A eligible expenses for an additional 365 days. However, it is this statement coupled with the $0.00 figure in the "You Pay" column that could cause confusion.

Surely it is because of the possibility of this sort of confusion that the state regulatory scheme mandates and the Outline of Coverage declares that the policy itself controls. As both the state regulation and the Outline state, the Outline is only a "very brief description" of the important features of the policy.

Thus because the state regulatory scheme obviously does not require the Outline of Coverage to be read into the contract but rather requires an explicit

---

**5.** BCBS argues that Rhode Island law applies. Although the Court persists in its earlier ruling that Florida law applies, the Court's conclusion would be the same under Rhode Island law. *See* R.I.Gen.Laws 27–18.2–6(b)(3) (1998); R.I. Dept Bus.Reg., Ins.Div.Reg. XLVI § 13(C)(3) (1990).

statement that the Outline is not a part of the contract and that the policy alone governs, and because the Outline itself states the same, the Court finds that the Outline of Coverage is not a part of the insurance contract. *See Vencor Inc. v. Standard Life and Accident Ins. Co.*, 65 F.Supp.2d 573 (W.D.Ky. 1999) (finding outline of coverage not to be part of contract where outline itself states that policy governs, and Tennessee law requires such a statement). Therefore, since the state regulatory scheme does not require that the Outline be read into the contract, the Court finds that the policy's merger clause controls, and the policy constitutes the entire contract.

■ Since the Outline of Coverage is not part of the contract, it constitutes parol evidence and is not admissible to create an ambiguity in the contract.[6] It is well established under Florida law that parol evidence is inadmissible to vary or contradict the clear and unambiguous language of a contract. *See J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So.2d 484, 485–86 (Fla.1957). Courts may "consider extrinsic evidence only when confronting an ambiguous contract provision, and courts are barred from using evidence to create an ambiguity to rewrite a contractual provision[.]" *J.C. Penney Co., Inc. v. Koff*, 345 So.2d 732, 735 (Fla. 4th DCA 1977) (*cited with approval in Uransky v. First Federal Savings & Loan Ass'n of Fort Myers*, 684 F.2d 750, 754 (11th Cir.1982)).

6. The Court also finds that the promotional brochure is parol evidence and no significance should be accorded it in interpreting the policy.

7. The Court of Appeals reserved the question whether the policy standing alone would support Vencor's position. *BCBS II*, 169 F.3d at 681 n. 10.

8. Several other courts in unpublished opinions have concurred that under such Medigap policies the insurer is only required to pay what Medicare would have paid. *See Vencor, Inc. v. National States Insurance Company*, No. 97–2350–CIV–ROS (D.Ariz. July 9, 1999)

This Court previously found that the language of the contract is clear and unambiguous. *BCBS I*, 929 F.Supp. at 422. The Court persists in that ruling. Because there exists no ambiguity in the contract language, neither the Outline of Coverage nor the promotional brochure may be consulted for aid in interpreting the contract.

2. *What Constitutes "Health Care Expenses" Under the Policy*

Having found that the Outline of Coverage is not part of the contract, the Court must now determine what constitutes "health care expenses" under the policy.[7] In its previous ruling, the Court implicitly defined "health care expenses" to mean amounts of expenses. *BCBS I*, 929 F.Supp. at 422. The Court stated that BCBS is obligated to pay ninety percent of the *charges* that Medicare Part A would have paid had its coverage not been exhausted. *Id.*

Several other federal courts have addressed whether Vencor may collect its standard rates. Those courts agree with this Court that the term "health care expenses" in this type of Medigap policy refers to amounts, not solely types, of expenses. *E.g., Standard Life and Accident*, 65 F.Supp.2d at 579 (finding that insurer is only required to reimburse at Medicare per diem rate).[8] *But see Vencor Hospitals South, Inc. v. National States Insurance Co.*, No. 94–894, 1995 U.S.Dist.LEXIS 21544, at *1 (M.D.Fla. June 22, 1995) (find-

(holding that "Medicare-eligible Expenses" refers solely to the cost of medical services); *Vencor Hospitals Texas, Ltd. v. Standard Life and Accident Insurance Company*, No. A–97–CA–606–JN (W.D.Tex. Oct. 7, 1998) ("The phrase 'Medicare eligible expenses' clearly refers to the actual amount allowable under Medicare."), *aff'd*, No. 98–51132 (5th Cir. Dec.23, 1999); *Vencor Hospitals, Inc. v. Standard Life and Accident Insurance Company*, 97–1976–CIV–T–26E (M.D.Fla. Sept. 22, 1998) (same; referring to the "unambiguous policy language" in *BCBS I*; distinguishing between types of services "covered" and expenses "allowed").

ing contract ambiguous and interpreting in favor of insured thus allowing payment of amounts billed by provider), *aff'd per curiam*, 120 F.3d 274 (11th Cir.1997).

■ The Court finds that its initial ruling was correct. "Health care expenses" as used in the insurance contract cannot refer exclusively to types of treatment.

Vencor contends that the contract language is ambiguous and should be construed against BCBS. Vencor further asserts that "health care expenses" refers to types of services, not cost amounts.

It is true that under Florida law in the case of ambiguity in an insurance contract the ambiguity is to be construed against the insurer and in favor of the insured. *Goldsby v. Gulf Life Ins. Co.*, 117 Fla. 889, 891, 158 So. 502 (Fla.1935); *see also BCBS II*, 169 F.3d at 681. However, this rule does not apply when the language of the contract is clear and unambiguous. *Goldsby*, 117 Fla. at 891, 158 So. at 502. As the Florida Supreme Court stated in *Goldsby*,

> When there is no room for doubt, insurance contracts, like other contracts are to be construed according to the sense and meaning of the terms which the parties have used, and, if clear and unambiguous, these terms are to be taken and understood in their plain and ordinary sense.

*Id.; see also Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1548–49 (11th Cir.1996). To find the plain and ordinary meaning of words, one looks to the dictionary. *Beans v. Chohonis*, 740 So.2d 65, 67 (Fla. 3d DCA 1999).

This Court has looked in several dictionaries, and all support the BCBS interpretation. The crucial word in the disputed term is "expense." Vencor contends that this word refers to types of services only. BCBS argues that "expense" refers to cost amounts for services. The dictionaries that the Court has reviewed are consistent in their collectively defining "expense" to refer to cost.[9]

Having conducted a thorough search, nowhere has this Court been able to find a definition of the word "expense" that defines it as a service. Every definition of "expense" whether in a new dictionary or old, or even on-line, makes clear that the word "expense" refers to a cost or outlay. Therefore, by the very definition of the words, the contractual term "health care expenses" must refer to costs of health care treatments.

The Court is unable to define the term as Vencor suggests. Such a definition would require a convolution of the contract language. As the Ninth Circuit held regarding an ERISA policy, "If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir.1990) (*quoted in Northwestern National Life Ins. Co. v. Rutta*, 599 So.2d 684, 686 (Fla. 4th DCA 1992)); *see American Manufacturers Mut. Ins. Co. v. Horn*, 353 So.2d 565 (Fla. 3d DCA 1977), *cert. denied*, 366 So.2d 885 (Fla.1978) ("[T]he policy should receive a reasonable, practical and

---

**9.** For example, Webster's Dictionary defines "expense" as "the act or practice of expending money: SPENDING ... something that is expended in order to secure a benefit or bring about a result" and "the financial burden involved typically in a course of action or manner of living: COST[.]" *Webster's Third New International Dictionary* 800 (unabridged ed.1975). Random House defines "expense" as "cost or charge." *The Random House College Dictionary* 465 (rev. ed.1980). Likewise, Black's defines "expense" as, "That which is expended, laid out or consumed. An outlay; charge; cost; price." *Black's Law Dictionary*

577 (6th ed.1990). The Court even used the internet to find an on-line definition. WWWebster Dictionary defines "expense" as "something expended to secure a benefit or bring about a result ... financial burden or outlay: COST[.]" *Webster Dictionary* (2000) <http://www.m-w.com/cgi-bin/dictionary>.

Additionally, in researching thesauri, synonyms for expense include: expenditure, cost, outlay, and disbursement. *See Roget's International Thesaurus* 550 (3d ed.1962); *see also WWWebster Thesaurus* (2000) <http://www.m-w.com/cgi-bin/thesaurus>.

sensible interpretation consistent with the intent of the parties, not a strained, forced or unrealistic interpretation.").

This Court agrees and finds that in the context of a Medigap policy, where a reasonable interpretation favors the insurer, the Court need not torture the language of the policy to create an otherwise unreasonable conclusion in favor of the insured, much less in favor of a third party beneficiary. Hence, the Court finds that the plain and ordinary meaning of the term "health care expenses" refers to the costs of expenses.

Consequently, "Medical Eligible Expenses" can only refer to costs that would be eligible for payment under Medicare. Such a conclusion is mandated by the policy's very own definition of the term. (BCBS Policy, § 1.1)

Further, reading the term "Medical Eligible Expenses" in the full context of the policy, there is no doubt that it refers to costs. For instance, the policy defines the eligible expenses to be those health care expenses covered under Medicare and that Medicare has determined are "reasonable *and* medically necessary." (BCBS Policy, § 1.1) (emphasis added). Vencor argues that the "reasonable" language strengthens its argument that "expenses" refers to particular items of hospital expense. However, Vencor's own example of a business traveler seeking reimbursement—

"[s]o long as the costs incurred are reasonable"—proves the very point that "reasonable" refers to costs. (*See* Vencor Supp. Br. at 10).

Under the policy, "medically necessary" obviously refers to the type of expense—i.e., whether a particular treatment is medically necessary. Clearly, a cost cannot be medically necessary. Likewise, "reasonable" necessarily refers to the cost—i.e., whether the cost of a particular treatment is reasonable.[10] For both to refer to the type of expense, as Vencor argues, would be alternatively redundant and contradictory. If a treatment is medically necessary, that type of treatment must therefore be reasonable.[11] However, a type of treatment can be reasonable and not be medically necessary.[12] The conjunctive "and" indicates that the treatment must be both.[13] Thus in order to avoid the above conundrum, the two terms must refer to different things—an expense must be for a treatment of a type that is medically necessary, and the cost of such treatment must be reasonable.[14] Accordingly, by the requirement that they be reasonable and medically necessary, it is evident that "health care expenses" refers to both type and cost of treatment.

In addition, the policy language states that BCBS will pay "up to ninety percent (90%) of all Medicare Part A Eligible Expenses" during the period after expiration

---

**10.** Moreover, the Medicare statutes and regulations provide support for such an interpretation. Under the Medicare statutes and regulations, "reasonable" is used to refer to the amount allowable by Medicare. *E.g.,* 42 U.S.C. § 1395f(b)(1) (1992) (referring to "reasonable cost"); 42 C.F.R. § 413.1(b) (October 1, 1999) (referring to "reasonable costs" for services); *see also* 42 U.S.C. § 1395y(a)(1)(A) (1992) (stating that expenses must be reasonable and necessary).

**11.** For example, if a patient needs a respirator to breathe, it is medically necessary. Since the type of treatment is necessary to keep the patient alive, it must therefore be reasonable to use this type of treatment.

**12.** For example, it may be a reasonable treatment to give a particular patient a private room and a special diet. However, if such

types of treatment are merely for the patient's comfort, while reasonable, they are most likely not medically necessary.

**13.** Vencor's argument addresses these terms in the disjunctive, first discussing kinds of treatment as medically necessary, then discussing kinds of treatment as reasonable.

**14.** Therefore, where the use of a respirator (the type of treatment) is medically necessary, the cost charged to Medicare must also be reasonable. If Medicare determines the cost to be unreasonable, it is thus not a Medicare Eligible Expense. And a private room, where not medically necessary is also not a Medicare Eligible Expense.

of the lifetime reserve days. (BCBS Policy, § 3.1). Ninety percent is a quantitative amount and thus makes sense only if it refers to cost. It would be nonsensical to say ninety percent of a type of treatment.[15] If it was the contracting parties' intent that "Medicare Eligible Expenses" refer solely to types of services, then the policy necessarily would have used language such as, "cover up to *90% of the costs* of Medicare Eligible Expenses." In that way it would make sense to interpret "Medicare Eligible Expenses" to refer solely to types of treatment. However, as the policy language exists, it can only be read to refer to the costs of treatment.

Also, the policy states, "Benefits under this agreement will change automatically if the related Medicare Eligible Expenses change." (BCBS Policy, § 4). The policy expressly defines the term "Benefit" to mean "the *amount we pay* to supplement Medicare Eligible Expenses." (BCBS Policy, § 1.1) (emphasis added). Both sections are clearly referring to a cost amount. Under § 4, the amount that BCBS pays will change if the amount Medicare pays changes. Under § 1.1, "Benefit" is the amount BCBS pays to supplement the amount that Medicare pays.

"Medicare Eligible Expenses" must be used consistently throughout the contract. Thus, the term could not mean one thing in §§ 4 and 1.1, and mean something else in § 3.1. Therefore, viewing the term "Medical Eligible Expenses" in the full context of the contract, the Court finds that the term must refer to costs of treatment.

Overall, the Court finds that the term "health care expenses" as used in the insurance contract is clear and unambiguous. The plain definition of such term can only be taken to refer to amounts of costs. Additionally, the context in which such language is used further indicates an unmistakable intent that the term refer to amounts of costs.

It is worth noting that the Court of Appeals seemed concerned that if BCBS is not liable for the full amount of Vencor's standard charges—three to four times the amount of the Medicare charges—the insureds may be. Vencor likewise spends much of its time arguing the equities of this case. Specifically, Vencor argues that it would be inequitable and contrary to the intent of the state and federal regulatory schemes to leave the patients liable for the balance of Vencor's standard charges.

The Court agrees with Vencor that it would not be fair or proper under the state and federal regulatory schemes to agree with the BCBS interpretation of the contract and at the same time allow Vencor to charge its full rates thus passing the difference along to the patients. Public policy and the federal and state regulatory schemes require that the Vencor not be allowed to "balance bill" the insureds for the difference between the Medicare rate and Vencor's standard charges.[16]

---

15. For instance, it would be ridiculous to say that a policy will pay for ninety percent of a semi-private room. If a room is 100 square feet, does that mean that only ninety square feet are covered? Could the insured not use those other ten square feet? However, it makes perfect sense to say that the policy will pay ninety percent of the cost of a semi-private room. Then, the insured gets the benefit of all 100 square feet of the room.

16. Such a result is mandated by current federal law, under which Vencor would not be allowed to charge above the Medicare rate. *See Vencor, Inc. v. Physicians Mutual Ins. Co.,* 39 F.Supp.2d 1, 4 (D.D.C.1999) (under 1992 federal regulations Vencor must accept payment from Medigap insurer at Medicare approved rates as payment in full and is not entitled to recover from insured the difference between its standard charges and the Medicare per diem rate paid by the Medigap insurer). However, such relevant regulations were promulgated after the policies in this case were issued. *See BCBS II,* 169 F.3d at 681 n. 8.

Although these federal guidelines were promulgated after these policies were issued, the Court finds that the previous federal and state regulatory scheme and equitable considerations would require the same result.

The insureds should not be required to pay more than the ten percent co-payment required by the Medigap policy. Such co-payment would of course be limited to ten percent of the amount Medicare would have paid. Accordingly, Vencor's recovery would have to be limited to the amount that it could recover under Medicare Plan A.

However, the previous discussion is academic because this issue is not properly before the Court in this case. Although one of Vencor's Counts is based on subrogation of the insureds' rights, such rights would be for suit against BCBS, not against Vencor itself. Under a theory of subrogation, Vencor would succeed to nothing more than that to which the insureds would be entitled from BCBS. Since the Court finds that BCBS is liable only for the amount that Medicare would have paid, the insureds themselves could not recover the balance of Vencor's standard charges from BCBS.

Since Vencor is not presently suing the insureds for the balance of its standard charges, nor are the insureds suing Vencor to recoup any such payments made,[17] there exists no case or controversy between Vencor and the insureds. Therefore, this Court has no jurisdiction or occasion to decide the hypothetical issue of whether Vencor could collect the balance of its standard charges from the insureds.

## B. THE AMOUNT OWED TO VENCOR UNDER THE BCBS INTERPRETATION

Having found that the BCBS interpretation of the policy is correct, the Court must next determine what amount Vencor is due under the policy. In its brief, BCBS states that it and Vencor are attempting to come to an agreement as to the amount that Medicare would have paid.

Therefore, the Court will reserve ruling on this issue. At the hearing on accord and satisfaction, the parties should be prepared either to present the amount on which they agree or to present argument and evidence as to what that amount should be.

## C. ACCORD AND SATISFACTION

Since the Court has found that under the contract BCBS owes Vencor ninety percent of the amount which Medicare would have paid had Medicare Plan A not expired, the issue of accord and satisfaction is moot. However, in an abundance of caution and in the interest of temporal economy, the Court will hold an evidentiary hearing on this issue.

The parties state that a hearing on this issue should last less than one day. Therefore, notwithstanding the above findings and decisions, the Court will hold an evidentiary hearing and make a finding as to the issue of accord and satisfaction of the Esposito claim.

## D. PROMISSORY ESTOPPEL

Finally, since the Court finds that the BCBS interpretation of the contract is correct, it is proper to address Vencor's assertion of promissory estoppel.

In Count III of its Complaints, Vencor asserts:

> Vencor . . . contacted BCBS to verify coverage and amounts. BCBS acknowledged that Butler [and Esposito were] its insured[s] and that the proposed treatment by Vencor to Butler [and Esposito] was covered under Butler's [and Esposito's] polic[ies].

Vencor also now claims that since Vencor brought its action on behalf of Mrs. Butler and Mr. Esposito, the promissory estoppel claims raised by Vencor include the claims of Mrs. Butler and Mr. Esposito, "both of whom relied on BCBS's promises that they would pay '$0.00.'" (Vencor Reply Brief, at 6). The Court

---

17. Apparently Vencor settled with Ms. Butler for $42,000.00 and her rights to reimburse-ment under any insurance policy.

shall address each of these claims in turn.

■ Under a theory of promissory estoppel,

a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcing the promise.

*W.R. Grace & Co. v. Geodata Services,* 547 So.2d 919, 924 (Fla.1989) (quoting Restatement (Second) of Contracts § 90 (1979)). "For promissory estoppel to be applied, the evidence must be clear and convincing." *Id.* at 925. Additionally, promissory estoppel does not apply if the terms of the promise are indefinite. *Maccaferri Gabions, Inc. v. Dynateria, Inc.,* 91 F.3d 1431, 1443–44 (11th Cir.1996) (citing *Geodata,* 547 So.2d at 924), *cert. denied,* 520 U.S. 1167, 117 S.Ct. 1430, 137 L.Ed.2d 539 (1997).

■ First, Count III of the Complaints asserts that Vencor justifiably and detrimentally relied on the promises of BCBS. Taking the facts alleged in the Complaints as true, Count III merely asserts that BCBS acknowledged that the insureds were covered for the *type* of treatment that Vencor proposed. Vencor does not allege that BCBS made any acknowledgments as to costs of a treatment. Vencor merely alleges that BCBS acknowledged that the proposed *treatment* was covered. In Count III, Vencor alleges nothing about statements regarding the costs of such treatment. Thus given the distinction between kinds of treatment and costs of treatment discussed above, the Court finds that Vencor's promissory estoppel claim goes only to types of treatment.

Second, even if the Complaints did assert a sufficient cause of action for promissory estoppel, the Court finds that Vencor has failed to raise any genuine issue of material fact as to the validity of such a cause. Thus, the Court finds that summary judgment is appropriate.

As BCBS points out, Vencor's own employee, Henri Pelletier, who had the responsibility for verification of insurance coverage and collection of bills testified on deposition that Vencor asks patients for copies of health insurance policies in order to substantiate coverage. He also testified that he would seek only the policy itself for coverage substantiation. Moreover, Mr. Pelletier stated that all insurance companies disclaim any figures given over the telephone. Last, Mr. Pelletier testified that generally health insurers do not quote dollar figures for reimbursement, and he cannot recall having ever reached an agreement by telephone with an insurer as to a specific dollar amount. (BCBS Stmt. of Undisp. Facts at ¶ 59).

Therefore, even if Vencor's Complaints did allege that BCBS made representations about reimbursements for costs of treatments, Vencor has introduced no evidence that any such representations were definite, nor than any reliance thereon would be reasonable. Vencor does not attempt to rebut BCBS's assertions, but merely argues that its promissory estoppel claim is also based on BCBS's representations to the insureds.

Vencor's assertion that its promissory estoppel claims include the claims of Mr. Esposito and Ms. Butler, who relied on the promises of BCBS that they would pay "$0.00," is improper. This is a new argument that is raised for the first time now, over five years after Vencor filed its Complaints. Vencor's Complaints state no claim of promissory estoppel based on promises to the insureds. Contrary to the recent assertions of Vencor, the only allegation of promissory estoppel is that BCBS made representations to Vencor and that Vencor relied thereon.

Assuming arguendo, if the Court were to allow Vencor's promissory estoppel claim on behalf of the insureds, the Court finds that this claim would fail as well. At most, if the insureds did reasonably rely to their detriment on the Outline of Coverage, BCBS would have to pay 100% of what

Medicare would have paid. Given the language of the Outline and that of the insurance contract itself and the above findings, the only reasonable reliance by the insureds may have been in thinking that BCBS would pay 100% of what Medicare would have paid. Thus even if the insureds did have a promissory estoppel claim, it would be for the 10% co-payment—10% of what Medicare would have paid.

 However, viewing the evidence in the light most favorable to the insureds, the Court finds that the representation in the Outline of Coverage does not constitute a definite statement sufficient to induce reasonable reliance. Although the statement in the Outline may have caused some confusion, the Outline plainly stated that the insureds should have consulted the policy itself for definite statements as to coverage. Thus the statement in the Outline was at most an indefinite statement insufficient to induce reasonable reliance. *See Maccaferri Gabions,* 91 F.3d at 1443–44.

Moreover, since the insureds already paid the BCBS co-payment amount to Vencor, it would be improper for Vencor to recover it once again.

Therefore, the Court finds that there exist no genuine issues of material fact as to Vencor's claim of promissory estoppel. Viewing the evidence in the light most favorable to Vencor and the insureds, the Court finds that judgment is appropriate for BCBS on Count III of Vencor's Complaints.

## III. CONCLUSION

In conclusion, the Court finds that the Outline of Coverage and the promotional brochure are not part of the insurance contract. Further, according to the clear and unambiguous terms of the contract, the term "Medical Eligible Expenses" refers to costs, not solely types, of treatment. Thus, Vencor is entitled to reimbursement by BCBS for ninety percent (90%) of what Medicare would have paid.

The Court shall reserve ruling on what that amount is.

The Court also finds that BCBS is entitled to summary judgment on Vencor's claim of promissory estoppel. Vencor has put forth no evidence that BCBS made any sort of promise as to the amounts that it would pay. Further, until recently, Vencor never asserted a promissory estoppel claim on behalf of the insureds. Even if it had, the Court finds that Vencor has put forth no evidence that BCBS made any definite promise to the insureds regarding the amount it would pay.

Although the Court finds that BCBS is entitled to summary judgment on all counts of the Complaints, in an abundance of caution and in the interest of time, the Court will hold a brief evidentiary hearing on BCBS's claim of accord and satisfaction.

Accordingly having considered the Order of the Eleventh Circuit Court of Appeals, the briefs of the parties, and the record in this matter, and being otherwise duly advised, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Summary Judgment is **GRANTED** in favor of Defendant Blue Cross Blue Shield of Rhode Island on all counts of Plaintiff's Complaints;

2. Notwithstanding the granting of summary judgment in favor of Defendant, the Court shall hold an evidentiary hearing on the issue of accord and satisfaction as to the claim regarding Aniello Esposito. This hearing shall be held before this Court on Friday, May 12, 2000, at 10:00 a.m. The parties shall provide witness and exhibit lists no later than April 28, 2000.