**VENCOR, INC. d/b/a Vencor Hospitals Texas, LTD., d/b/a Vencor Hospital–Houston Northwest, d/b/a THC of Texas, Inc., d/b/a Vencor Hospital–New Orleans, d/b/a THC of Louisiana, Inc., d/b/a Vencor Hospital–Sycamore, d/b/a Vencor Hospital–Sacramento, d/b/a Vencor Hospitals California, Inc., d/b/a Vencor Hospital–Houston, d/b/a Vencor Hospital–Dallas, Appellant,**

v.

**PHYSICIANS MUTUAL INSURANCE CO., Appellee.**

**No. 99–7089.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 2000.

Decided May 23, 2000.

Bradley L. Kelly argued the cause for appellant. With him on the briefs was Laura J. Oberbroeckling.

James J. Frost argued the cause for appellee. With him on the brief were Stephen A. Fennell and Terrence D. O'Hare. Roger E. Warin entered an appearance.

Before: SILBERMAN, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Vencor, Inc., a provider of longterm hospital care, filed a diversity action[1] against Physicians Mutual Insurance Company, seeking reimbursement for expenses incurred by 10 patients who stayed in six of its hospitals beyond the period covered by Medicare. Each of the patients held "Medigap" insurance policies issued by Physicians Mutual; Vencor sues as third party beneficiary. Among other defenses, Physicians Mutual claimed that certain provisions of the Medicare Act and associated regulations barred Vencor from charging patients more than the maximum rate for Medicare-covered hospital days—a rate at which Physicians Mutual had already reimbursed Vencor. The district court granted Physicians Mutual's motion for summary judgment on that limited ground. *Vencor, Inc. v. Physicians Mutual Insurance Co.*, 39 F.Supp.2d 1 (D.D.C.1999). Finding no such limitation in the cited provisions, we reverse.

\* \* \*

Medicare, like most health insurance plans, provides benefits of limited duration. For instance, it covers the first 90 days of hospital care for every "spell of illness," plus an additional, non-renewable reserve of 60 days of coverage (which, until it is exhausted, can be added to any "spell of illness"). 42 U.S.C. § 1395d(a)-(b), (g). Once Medicare patients fully exhaust their government-provided hospital benefits, see *id.* §§ 1395c, 1395d, many rely on privately purchased "Medigap" policies for extended coverage. These policies vary in their terms, but (as a result of a federal regulatory process that we will soon describe) all offer at least 365 days of post-Medicare hospital benefits. See Medicare Program; HHS' Recognition of NAIC Model Standards for Regulation of Medigap Policies, 57 Fed.Reg. 37,980, 37,991/1 (1992).

While the Medicare reimbursement rates of most hospitals are governed by the so-called Prospective Payment System, see 42 U.S.C. § 1395ww(d)(1)(B)(iv), Vencor, as an operator of long-term care hospitals, can secure reimbursement for the "reasonable cost" of providing its services. *Id.* §§ 1395f(b)(1), 1395x(v). For Medicare-covered services, it must generally accept this amount as payment in full. See *id.* § 1395cc(a)(1)(A).

Vencor and Physicians Mutual filed cross motions for partial summary judgment on the limited question of whether the Medicare statute or associated federal regulations prohibited it from charging *patients* for post-Medicare services at more than the Medicare-approved rates. We emphasize the word "patients" because much of the legislative and regulatory materials that the parties dispute speak only to insurers' obligations. Of course for a third-party beneficiary's breach of contract action, the patient's liability is the bedrock—without patient responsibility, there is no insurer responsibility. But insurer liability is often less than all of the pri-

---

1. Vencor also claimed the district court had federal question jurisdiction, which Physicians Mutual disputed. Given the presence of diversity jurisdiction, we need not reach the issue.

mary obligor's; provisions for deductibles and co-insurance are common, and some items and services may not be covered at all. Such insurer-specific limitations may affect Physicians Mutual's liability on these 10 contracts, but no such limitations are before us. The cross-motions for summary judgment frame the issue only in terms of patient liability.

\* \* \*

■ Physicians Mutual first argues that the Medicare Act itself prohibits Vencor from charging its patients more than the Medicare-approved rate. It relies initially on 42 U.S.C. § 1395cc(a)(1)(A), under which providers are eligible for Medicare reimbursement only if they execute a contract with the Secretary of Health and Human Services agreeing, among other things,

> not to charge ... any individual or any other person for items or services for which such individual is entitled to have payment made under this subchapter.

*Id.*

The most obvious difficulty with this provision as support for Physicians Mutual is that it appears to have nothing to do with charges for post-Medicare services. The "subchapter" (Subchapter XVIII, 42 U.S.C. §§ 1395–1395ccc) contains provisions under which providers are "entitled" to be paid by Medicare when their provision of services meets the many statutory qualifications. These appear to exhaust its provision of entitlements. Certainly Physicians Mutual points us to nothing in the subchapter that "entitles" providers to be paid for services provided after the lapse of Medicare entitlement. For such entitlements, presumably, they must rely on contract, or perhaps in some cases quasi-contract, under state law.

Physicians Mutual seeks to get around this impediment by claiming that because provisions in the subchapter establish conditions under which the National Association of Insurance Commissioners ("NAIC") may promulgate standardized Medigap insurance contracts, which under certain conditions become the exclusive form of lawful Medigap insurance contract, see *id.* § 1395ss(p), the subchapter "entitles" providers to be paid for services falling in the Medicare gap. But, skipping over the distinction between the liabilities of insurers and of patients (recall that it is the latter that the parties' motions for summary judgment have put in play; insurers' obligations follow only as a corollary), there is all the difference in the world between the contractual obligations of the common law, which create the entitlements of providers to be paid, and federal *limitations* on those entitlements. Section 1395ss does not entitle anyone to payment.

In an attempt to sidestep these difficulties, Physicians Mutual argues that Medicare's general purpose of providing "basic protection against the costs of hospital ... services," *id.* § 1395c, demonstrates a congressional intent to allow Medicare recipients to "extend the benefits and protections under the Medicare Act through the purchase of Medigap insurance." Appellee's Br. at 15. Even if Physicians Mutual were correct about the thrust of the statute's purpose, the Supreme Court has instructed that:

> [a]pplication of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Board of Governors of the Fed. Reserve Sys. v. Dimension Financial Corp.*, 474 U.S. 361, 373–74, 106 S.Ct. 681, 88 L.Ed.2d

691 (1986). See also *Rodriguez v. United States,* 480 U.S. 522, 525–26, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (noting that "no legislation pursues its purposes at all costs" and therefore "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law"). So radical a scheme as imposition of price controls on medical services not covered by Medicare requires explicit language, not mere brooding purposes (which, we should add, are in any event not discernible in § 1395ss).

Physicians Mutual also points to a specific provision of the Medicare statute governing "items or services ... in excess of or more expensive than" a covered service:

> Where a provider of services has furnished, at the request of such individual, items or services which are in excess of or more expensive than the items or services with respect to which payment may be made under this subchapter, such provider of services may also charge such individual or other person for such more expensive items or services to the extent that the amount customarily charged by it for the items or services furnished at such request exceeds the amount customarily charged by it for the items or services with respect to which payment may be made under this subchapter.

42 U.S.C. § 1395cc(a)(2)(B).

■ The parties curiously agree on the idea that this provision governs post-Medicare hospital days, differing only as to its effect. We, by contrast, regard it as altogether inapplicable—because confined to superior versions of covered services. (The parties' de facto stipulation of law does not require us to analyze a statute on a premise we regard as false. See *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am.,* 508 U.S. 439, 446, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993).)

The archetypal example of a service that falls within the ambit of this provision is a medically-unnecessary private room requested by the patient instead of the semi-private room covered by Medicare. In such cases, "the provider may bill the beneficiary for the difference between the private room and semi-private room charges." Medicare Program; Elimination of Medicare Indirect Subsidy for Private Rooms, 47 Fed.Reg. 42,676, 42,676 (1982). More generally, HCFA has referred to items in services subject to § 1395cc(a)(2)(B), as "luxury items and services," see Medicare Program; Prospective Payments for Medicare Inpatient Hospital Services; Interim Final Rule with Comment Period, 48 Fed.Reg. 39,752, 39,786/3 (1983), or as "partially covered" items and services, see Medicare as Secondary Payer and Medicare Recovery Against Third Parties, 54 Fed.Reg. 41,716, 41,740, 41,743 (1989). The additional days of hospital coverage at issue here do not fit these descriptions. Indeed, in search of its desired result, Physicians Mutual is driven to offer a thoroughly confusing and improbable view of § 1395cc(a)(2)(B). Physicians Mutual assumes that hospital services for pre-and post-exhaustion days are identical and that the "amount customarily charged" is the Medicare rate because that rate is paid by the majority of Vencor's patients. But after fitting these assumptions into the statutory language, the upshot is that providers would have to offer free hospital stays to post-exhaustion patients, as the difference between the two "amounts customarily charged" is zero. (Insurance would be no help to the provider, as insurers are obligated to pay only to the extent that the patient is.)

By contrast, applying the statute is simple in the case of a patient-requested luxury good or service. For example, if a provider offers a "standard appendectomy" at a customary charge of $400 (for which Medicare reimbursement is limited to $300), and a "super appendectomy" at a customary charge of $600, it would be entitled to charge only $500 (the basic $300 Medicare rate, plus the $200 premium) for the superior procedure.

Moreover, the triggering fact, the furnishing of such a service "at the request" of the recipient, seems to confirm our reading; the risk that services would be provided long past the Medicare limit, without a request, seems very limited (though not zero). The Secretary's implementing regulation not only requires patient request, see 42 CFR § 489.32(a)(2), but also requires the provider to inform the beneficiary that there will be a charge for the service "[t]o avoid misunderstanding," *id.* § 489.32(a)(3). It is hard to imagine that an extended hospital stay of several months' duration (which is the amount that would be "in excess of" Medicare benefits for most of the patients here) is the type of items or services for which a patient might fail to understand that "there will be a specified charge for that service." *Id.*

█ The statutes being rather unpromising material for Physicians Mutual, it turns to a "Model Regulation" written by NAIC. Again Physicians Mutual encounters a statutory difficulty: the authorizing legislation calls for regulation only of insurance contracts, *not* providers' services or compensation. See 42 U.S.C. § 1395ss(p). NAIC was to amend its existing Model Regulation to include no more than ten standardized Medigap insurance plans. See *id.* § 1395ss(p)(1)(A). Each plan was to include a minimum common core of benefits and offer benefits widely available in then-existing policies, while balancing the objectives of simplifying the market for Medigap insurance, avoiding adverse selection, providing consumer choice, providing market stability, and promoting competition. See *id.* § 1395ss(p)(2)-(3). As a result of the statutory program, no Medigap policy may issue unless either the relevant state insurance regulator, or in some circumstances

the Secretary, has a mechanism for ensuring that the policy meets the 1991 NAIC Model Regulation.[2] See *id.* § 1395ss(a)(2), (g)(2)(A), (k)(1)(A), (m), (p)(1). Physicians Mutual identifies nothing in the authorizing statute governing provider-patient charges, and we see no such grant of power to NAIC. If the Model Regulation purported to cover such charges, it would be ultra vires.

Unsurprisingly then, the text of NAIC's Model Regulation does not purport to cover such charges. The section relied on by Physicians Mutual reads as follows:

> Section 8. Benefit Standards for Policies or Certificates ...
>
> B. Standards for Basic ("Core") Benefits Common to All Benefit Plans. Every issuer shall make available a policy or certificate including only the following basic "core" package of benefits to each prospective insured. . . .
>
>> (3). Upon exhaustion of the Medicare hospital inpatient coverage including the lifetime reserve days, coverage of the Medicare Part A eligible expenses for hospitalization paid at [rates consistent with the ordinary hospital payment scheme] or other appropriate standard of payment, subject to a lifetime maximum benefit of an additional 365 days.

57 Fed.Reg. at 37,990–91.

Someone at NAIC has argued that this precludes provider charges above the Medicare rate because such charges are not "an appropriate standard of payment," Letter from Guenther Ruch, Chair, NAIC Senior Issues Task Force to Nancy–Ann Min DeParle, HCFA Administrator at 4, 5 (July 8, 1998) ("1998 NAIC Letter"), *reprinted in* Joint Appendix ("J.A.") 123, 127. But § 8(B)(3), like § 1395ss(p),

---

**2.** Three states, Massachusetts, Minnesota, and Wisconsin, took advantage of a waiver provision available to states with an alternative simplification program in place as of Novem-

ber 5, 1990, see 42 U.S.C. § 1395ss(p)(6), and therefore need not implement NAIC's Model Regulation.

makes no mention of limits on provider charges.

Perhaps recognizing that § 8(B)(3) applies only to insurers' obligations, Physicians Mutual turns to the Model Regulation's mandatory disclosure provision to support its claim. Section 16 states, in relevant part:

Section 16. Required Disclosure Provisions

. . .

C. Outline of Coverage Requirements for Medicare Supplemental Policies

(1) Issuers shall provide an outline of coverage to all applicants at the time application is presented to the prospective applicant . . .

. . .

(4) The following items shall be included in the outline of coverage in the order prescribed below.

. . .

Disclosures

Use this outline to compare benefits and premiums among policies.

Read Your Policy Very Carefully

This is only an outline describing your policy's most important features. The policy is your insurance contract. You must read the policy itself to understand all of the rights and duties of both you and your insurance company.

. . .

Notice

This policy may not fully cover all of your medical costs.

. . .

| SERVICES | MEDICARE PAYS | PLAN PAYS | YOU PAY |
|---|---|---|---|
| Hospitalization | | | |
| . . . | | | |
| —Once lifetime reserve days are used: | | | |
| —Additional 365 days | $0 | 100% of Medicare eligible expenses | $0 |
| —Beyond the additional 365 days | $0 | $0 | All costs |

57 Fed.Reg. at 37,997, 37,998, 38,000, 38,001.

Physicians Mutual points to the "YOU PAY" column of this table, which seems to say that the beneficiary pays "$0" for an additional 365 days of post-exhaustion hospitalization. 57 Fed.Reg. at 38,001, 38,003, 38,005, 38,008, 38,011, 38,014, 38,017, 38,020, 38,023, 38,027. The question posed is whether the table has any legal effect on providers' charges.

As a matter of federal law, the answer must be No. As we have seen, the autho-rization in § 1395ss(p) to NAIC (and to the Secretary as an alternative reviser of the Model Regulation) is confined to insurance contracts. Authority to create a class of standardized insurance contracts does not carry some implicit authority to regulate transactions that give rise to the potentially covered obligations.

The parties have nonetheless hotly disputed the meaning of various expressions of opinion by representatives of NAIC and the Secretary. Physicians Mutual relies heavily on the 1998 NAIC letter in which a NAIC official claimed that HCFA, "by

adopting the NAIC Model Act and Regulation as the federal standard for Medicare supplement insurance," has embraced § 16 of the Model Regulation, which "in substance limits the providers to charging only the Medicare-approved amount for hospitalization when Medicare benefits have been exhausted." 1998 NAIC Letter at 4, 5, J.A. at 126, 127. The 1998 NAIC Letter relies in part on a 1992 letter in which Thomas Hoyer, a HCFA official, interpreted the "day outlier" language in § 8(B)(3) of the Model Regulation. Letter from Thomas E. Hoyer, Jr., Director, Division of Provider Services Coverage Policy, HCFA, to. F. David Wythe, Insurance Analyst, Forms and Rates Section, Life, Accident and Health Division, South Carolina Department of Insurance at 3 (Feb. 12, 1992), J.A. at 136. Vencor, however, notes that just seven months earlier, NAIC had quite candidly admitted that it "cannot control what providers charge for their services" and asked HCFA to take action to ensure that providers accept the Medicare approved rates as payment in full for post–exhaustion hospital expenses. Letter from Glenn Pomeroy, Chair, NAIC Senior Issues Task Force to Nancy–Ann Min De-Parle, HCFA Administrator at 3 (Dec. 3, 1997), J.A. at 129, 131. Vencor also offers a more recent letter from HCFA in which the Deputy Administrator stated that neither Mr. Hoyer nor anyone else at HCFA has taken a position as to the 1991 NAIC Model Regulation's effects on providers' charges for post-exhaustion hospital care. See Letter from Michael Hash, HCFA Deputy Administrator to Bradley L. Kelly, Mintz, Levin, Cohen, Ferris, Glovsky & Popeo at 2–3 (Sept. 14, 1999).

To the extent that any of these letters attributes to § 16 of the Model Regulation any limitation on provider charges to pa-

tients, they exceed the unambiguous limits in the statutory sections relied upon. Thus, even if we were to assume that NAIC—a private entity—were entitled to deference, or that the Secretary were owed deference on her interpretation of regulations drafted not by her but by NAIC, compare *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512–13, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), the complete absence of statutory authority, even assuming the full application of deference under *Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), would fatally undercut the interpretation claimed by Physicians Mutual.[3]

In theory the following question remains: If a state adopts the Model Regulation in order to make the sale of Medigap policies lawful under federal law within its borders, could the text of § 16(C) have the effect asserted by Physicians Mutual? Recall that § 16(C) is simply a mandatory disclosure provision in a contract between patient and insurer. As such, it would seem a weak basis for a claim of a binding restraint on contracts between patients and providers.

Further, the language required by § 16(C)(4) itself explains that its purpose is simply to enable the insured to compare *premiums* and *benefits* (which are plainly independent of providers' rates), and warns patients (1) that the policy rather than the outline determines coverage, and (2) that the policy may not cover all of the patient's medical costs. Compare *Vencor Hosps. South v. Blue Cross and Blue Shield of R.I.,* 86 F.Supp.2d 1155, 1159–60 (S.D.Fla.2000) (concluding that under Florida Law the outline is not part of the

---

**3.** Thus we have no occasion to consider the effect of the Supreme Court's recent decision in *Christensen v. Harris County,* — U.S. —, 120 S.Ct. 1655, — L.Ed.2d — (2000) <http://www.supremecourtus.gov/opinions/99pdf/98–1167.pdf>, stating that when an agency provides interpretations of an ambiguous statute in documents that lack

the force of law (such as opinion letters and policy statements), such intepretations "do not warrant *Chevron*-style deference," *id.* at 1657, but are "'entitled to respect' under … *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but only to the extent that those intepretations have the 'power to persuade,'" *id.* at 1657.

insurance policy); *Vencor, Inc. v. Standard Life & Accident Ins. Co.,* 65 F.Supp.2d 573, 578 (W.D.Ky.1999) (same for Tennessee law). As Physicians Mutual has invoked the Model Regulation solely as a matter of federal law, however, disputes as to its meaning under state law are not before us.

Finally, we note that in denying Vencor's motion under Fed.R.Civ.P. 59(e) to alter or amend the judgment, the district court said that Vencor had waived its claim that the 1991 NAIC Model Regulation is inapplicable to the six patients whose policies took effect before August 21, 1992. It is not clear whether the district court would reach the same conclusion in light of our decision that the authorities invoked by Physicians Mutual do not bar Vencor from charging patients its standard rates for post-exhaustion hospital care. To avoid confusion, we emphasize that the claim remains live. If the district court on remand is called upon to interpret the individual insurance contracts, and if it concludes that any version of NAIC's Model Regulation has any impact on the outcome, it must determine which version was in effect in each relevant state at the time that each contract took effect.

\*　　\*　　\*

Because we find no statute or regulation that prohibits Vencor from charging its standard rates to patients who have exhausted their Medicare hospital benefits, we reverse the judgment of the district court and remand the case.

*So ordered.*