**VENCOR INC., Plaintiff–Appellant,**

v.

**NATIONAL STATES INSURANCE COMPANY, Defendant–Appellee.**

**No. 99–17148.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 10, 2001.

Filed Sept. 5, 2002.

Bradley L. Kelly, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Washington, DC, for the plaintiff-appellant.

David P. Brooks, Mesa, AR, for the defendant-appellee.

Before SNEED, WARDLAW, and BERZON, Circuit Judges.

Opinion by Judge BERZON; Concurrence by Judge SNEED.

## OPINION

BERZON, Circuit Judge.

This case at first glance concerns a private insurance dispute but, as we shall see, implicates important questions of national health policy for senior citizens. Vencor, Inc. ("Vencor"), an operator of several hospital and nursing home facilities, is the subrogee/assignee of a Medicare supplemental insurance contract between National States Insurance Company ("NSIC") and Clarence Rollins, a Medicare-eligible individual. In this diversity case, NSIC

paid Vencor Hospital–Phoenix ("Vencor Hospital") $38,760 for Rollins' care, the amount that Medicare would have paid. Vencor argues that NSIC did not pay it nearly enough. According to Vencor, Rollins' supplemental policy obligated NSIC to pay the full amount Vencor would have charged a non-Medicare patient, $171,197.78, so NSIC's failure to pay the full-billed charges constituted a breach of the contract. The district court, on summary judgment, held that there was no breach of contract. We affirm.

## I. BACKGROUND

### A. *Medicare Coverage and Medigap Insurance*

Medicare Part A provides limited inpatient hospital benefits to eligible citizens. During the first 90 days of hospitalization, Medicare pays for all covered services except for coinsurance and certain deductibles. 42 U.S.C. § 1395e(a). A patient hospitalized for more than 90 days may draw upon a non-renewable lifetime reserve of 60 days of additional Medicare coverage. 42 U.S.C. § 1395d; 42 C.F.R. § 409.61(a)(1)-(2). In exchange for receiving payments from Medicare, providers agree to accept that payment, along with any coinsurance or deductible, as payment in full. 42 U.S.C. § 1395cc(a)(1).[1]

Medicare beneficiaries who desire medical coverage in addition to the coverage provided by Medicare can purchase Medicare supplemental insurance policies, known as Medigap polices. *See id.* § 1395ss(g)(1). These policies provide purchasers with supplementary hospital-

ization coverage, including coverage of hospitalization costs after the patient exhausts all the hospitalization days Medicare will pay for. *See id.* §§ 1395ss(g)(1), 1395d.

After the Medicare program had been in effect for a while, Congress became concerned that older citizens were being exploited by the sale of Medigap policies that did not provide the coverage buyers thought they were purchasing. *See* Social Security Disability Amendments of 1980, Pub. L. No. 96–265, § 507(a) (June 9, 1980) (codified at 42 U.S.C. § 1395ss(f)(1)) (requiring evaluation of the effectiveness of state regulation of Medigap policies in limiting marketing and agent abuse and assuring dissemination of sufficient information to enable informed choice). Congress therefore amended the Social Security Act to establish a voluntary certification program for Medigap policies. Through that program, private insurers could receive federal certification for Medigap policies that met specific federal standards. *Id.* (codified as amended at 42 U.S.C. § 1395ss). At Congress's request, the National Association of Insurance Commissioners ("NAIC"), an organization of state insurance commissioners, developed the federal standards.

In 1990, Congress went further in protecting Medigap insurance consumers. Instead of its former voluntary program, Congress mandated that Medigap insurers conform their plans to one of ten model Medigap policies, to be developed by the NAIC.[2] Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, § 4351

---

1. 42 U.S.C. § 1395cc(a)(1) states:
 Any provider of services ... shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement—
 (A) (i) not to charge, except as provided in paragraph (2), any individual or any other person for items or services for which such

individual is entitled to have payment made under this sub-chapter ...

2. In 1992, the Health Care Financing Administration ("HCFA") promulgated regulations adopting the NAIC Model Regulations as revised in 1991. 42 C.F.R. § 403.200; 57 Fed. Reg. 37,980 (Aug. 21, 1992); *see also* 63 Fed. Reg. 67,078 (Dec. 4, 1998) (adopting the

(Nov. 5, 1990) (codified as amended at 42 U.S.C. § 1395ss(p)). As amended in 1994, the Medigap statute now provides that no Medigap policy may be issued in a state unless that state has provided "for the application and enforcement" of the 1991 NAIC Model Regulation ("Model Regulation"). Social Security Act Amendments of 1994, Pub.L. No. 103–432, § 171 (Oct. 31, 1994) (codified at 42 U.S.C. § 1395ss(a)(2)(A)).[3] *See also* 42 U.S.C. § 1395ss(p)(4)(A)(ii) ("[T]he Secretary may not provide for or permit the grouping of benefits (or language or format with respect to such benefits) under a medicare supplemental policy seeking approval by the Secretary unless such grouping meets the ... 1991 NAIC Model Regulation....").

Arizona, as required, adopted the Model Regulation. Ariz.Rev.Stat. Ann. § 20–1133(A); Ariz. Admin. Code § R20–6–1101 *et seq.* An Arizona regulation now provides that Medigap policies issued in the state must comply with a set of uniform standards identical to those in the NAIC Model Regulation. Ariz. Admin. Code § R20–6–1105. Under that regulation, all Medigap policies must contain the basic

set of core benefits provided for in the Model Regulation, known as package "A."[4] *Id.* § R20–6–1105(C); *see also* 57 Fed. Reg. at 37,991.

Key to this case is the language insurers are required to use in describing the core Medigap benefits provided. In language identical to the Model Regulation, Arizona law requires that the core benefit package include the following coverage:

> Upon exhaustion of the Medicare hospital inpatient coverage including the lifetime reserve days, coverage of the Medicare Part A-eligible expenses for hospitalization paid at the Diagnostic Related Group (DRG) day outlier per diem or other appropriate standard of payment, subject to a lifetime maximum benefit of an additional 365 days....

Ariz. Admin. Code § R20–6–1105(C)(3); *see also* 57 Fed. Reg. at 37,991.[5] An Arizona regulation, also in language prescribed by the Model Regulation, requires that all Medigap policies solicited or issued for delivery in Arizona contain certain definitions or terms. Ariz. Admin. Code § R20–6–1103(A). One of those definitions, central to this case, provides: " 'Medicare eligible expenses' shall be de-

---

NAIC Model Regulations, "as corrected and clarified by HCFA" to be the "applicable NAIC Model Regulation" for the purposes of Medigap insurance). None of HCFA's clarifications or changes are relevant here.

3. This statute states:

(2) No medicare supplemental policy may be issued in a State on or after the date specified in subsection (p)(1)(C) of this section, unless—
(A) the State's regulatory program under subsection (b)(1) of this section provides for the application and enforcement of the standards and requirements set forth in such subsection (including the 1991 NAIC Model Regulation or 1991 Federal Regulation (as the case may be)) by the date specified in subsection (p)(1)(C) of this section....
42 U.S.C. § 1395ss(a)(2)(A).

4. In addition, under both the Model Regulation and the Arizona implementing regulations, insurers may, if they so choose, offer additional coverage in the form of other uniform packages of benefits. *Id.* §§ R20–6–1105(D); R20–6–1106(E).

5. Under Medicare Part A, most providers of inpatient hospital stays are paid pursuant to a Prospective Payment System ("PPS"). 42 U.S.C. § 1395ww(d); 42 C.F.R. pt. 412. PPS providers collect payments from Medicare at a predetermined rate based upon the "diagnostic related group" ("DRG") classification of the patient's illness, as determined at the time of admission. PPS providers may receive additional reimbursement for hospitalizations that result in unusually long lengths of stay or unusually high costs—that is "outlier" cases. 42 U.S.C. § 1395ww(d)(5)(A)(i); 42 C.F.R. § 412.80 *et seq.*

fined as expenses of the kinds covered by Medicare, to the extent recognized as reasonable and medically necessary by Medicare." *Id.* § R20–6–1103(A)(7); *see also* 57 Fed. Reg. at 37,988.

Further, in compliance with federal law and the Model Regulation, Arizona law requires that insurers provide all applicants for Medigap insurance with a guide that outlines the benefits provided. Ariz. Admin. Code § R20–6–1113(C) & app. B; 42 U.S.C. § 1395ss(p)(9)(B) (requiring Medigap insurers to provide individuals, "before the sale of the policy, an outline of coverage which describes the benefits under the policy ... on a standard form approved by the State regulatory program or the Secretary (as the case may be) consistent with the 1991 NAIC Model Regulation ..."); 57 Fed. Reg. at 37,997–98.[6] This "Outline of Coverage" ("Outline") must contain a chart explaining that, for an additional 365 days of hospitalization after all lifetime reserve days are used, Medicare pays $0, the Medigap insurer pays "100% of Medicare–Eligible expenses," and the insured pays $0. Ariz. Admin. Code § R20–6–1113(C) & app. B; *see also* 57 Fed. Reg. at 38,001–31. In accordance with the Model Regulation, the Arizona regulation requires that, beneath the heading "READ YOUR POLICY VERY CAREFULLY," the Outline caution:

This is only an outline describing your policy's most important features. The policy is your insurance contract. You must read the policy itself to understand all of the rights and duties of both you and your insurance company.

Ariz. Admin. Code § R20–6–1113(C) & app. B; 57 Fed. Reg. at 37,998. The state regulations also require that the Outline contain the additional warning: "This policy may not fully cover all of your medical costs."[7] Ariz. Admin. Code § R20–6–1113(C) & app. B.

## B. *Rollins' Insurance Policy with NSIC*

Rollins was a patient at Vencor Hospital, a long-term intensive-care hospital, from November 6, 1993, until his death on April 23, 1994. The Medigap policy Rollins purchased from NSIC covered Rollins' hospital stay after March 3, 1994, when his Medicare coverage ran out.

During the time Medicare covered Rollins, Vencor billed Medicare directly for his care (except for coinsurance and a deductible, which NSIC paid). The bills listed charges based on Vencor's standard rates, but Medicare reimbursed Vencor for Rollins' hospitalization at a greatly discounted per diem rate, and Vencor accepted this amount as payment in full.[8] *Id.* § 1395cc(a)(1)(A).

---

6. If the insurer violates this requirement, it is subject to a civil monetary penalty of up to $25,000. 42 U.S.C. § 1395ss(p)(9)(C).

7. The Arizona regulations also command that insurers distribute the "Guide to Health Insurance for People with Medicare in the form developed jointly by the [NAIC and HCFA]." Ariz. Admin. Code § R20–6–1113(A)(6). This "Buyer's Guide" lists the insurance policy's benefits, including the following description of the Medigap core benefit package's hospitalization coverage:

After all Medicare hospital benefits are exhausted, coverage for 100% of the Medicare Part A eligible hospital expenses ... This

benefit is paid either at the rate Medicare pays hospitals under its Prospective Payment System or another appropriate standard of payment.

NAIC & HCFA, *1993 Guide to Health Insurance for People with Medicare,* at 11 (1993) (reprinted by NSIC).

8. Vencor is excluded from the PPS/DRG payment system because it is a long-term acute care hospital. *See* 42 C.F.R. § 412.23(e). Rather than reimbursing Vencor and other PPS-exempt hospitals based upon DRG classifications, Medicare reimburses them the "reasonable cost" of services for Medicare beneficiaries, at a per diem rate for each day that a

After Rollins exhausted his Medicare hospitalization benefits, NSIC paid for Rollins' hospital expenses until his death seven weeks later. Vencor billed $171,197.78 for this care, based on its standard rates.[9] NSIC paid only $38,760, basing its payments on the same much lower per diem rate that Medicare had been paying. As a result, $132,437.78 of Vencor's billed charges for Rollins' care remains unpaid. Vencor's central claim in this case is that the Medigap policy between Rollins and NSIC obligated NSIC to pay that difference.

The question in this case therefore turns on the coverage provided in the Medigap policy that Rollins purchased from NSIC. Only the core benefits provision of that policy, common to all Medigap policies, is here relevant. *See* Ariz. Admin. Code § R20–6–1105.

The NSIC Medigap policy describes Rollins' hospitalization coverage in language similar to that used in the Arizona Regulation, which incorporates the federally-mandated standards:

HOSPITAL BENEFIT–We will provide:

(a) Coverage of Part A Medicare-eligible expense for hospital confinement to the extent not covered by Medicare, from the 61st day through the 90th day in any Medicare benefit period.

(b) Coverage of Part A Medicare-eligible expense for hospital confinement to the extent not covered by Medicare for each Medicare lifetime inpatient reserve day used.

(c) Upon exhaustion of the Medicare hospital inpatient coverage including the lifetime reserve days, coverage of the Medicare Part A eligible expenses for hospital confinement to the same extent as would have been covered by Medicare, subject to a lifetime maximum benefit of an additional 365 days.[10]

Again as required by Arizona law, the policy defines "Medicare-eligible Expense" as "expense of the kind covered by Medicare, to the extent recognized as reasonable and medically necessary by Medicare."

NSIC also provided Rollins the mandated Outline of Coverage, Ariz. Admin. Code § R20–6–1113(C), and the Buyer's Guide, *id.* § R20–6–1113(A)(6), both of which described the hospitalization benefit as prescribed by the laws explained above.

These materials give rise to the present controversy: NSIC maintains that its commitment under these documents—the only commitment required by federal and state Medigap insurance regulation—was to pay Rollins whatever Medicare would have paid for his hospitalization. Vencor insists, to the contrary, that the promise must have been to pay Vencor's full-billed charges, as the regulations do not expressly limit what Vencor can charge yet mandate a representation that the covered patient will pay "$0." In the end, of course, either the patient's family or the insurance

patient has Medicare Part A benefits. *See* 42 U.S.C. §§ 1395f(b)(1), 1395x(v); 42 C.F.R. § 412.22(b) & pt. 413. For Medicare-covered services, such providers must generally accept this amount as payment in full. 42 U.S.C. § 1395cc(a)(1)(A)(i).

**9.** It is worth noting that in a world in which patients are covered by Medicare and various other kinds of medical insurance schemes that negotiate rates with providers, providers'

supposed ordinary or standard rates may be paid by a small minority of patients.

**10.** The Arizona regulation and the Model Regulation use almost identical language to describe provisions (a) and (b). The language used in provision (c) uses the phrase "to the same extent as would have been covered by Medicare" instead of "paid at the [DRG] day outlier per diem or other appropriate standard of payment."

company will have to pay the billed amount, or the hospital will have to accept the much lower Medicare rate. As will appear, however, it is not necessary in this case fully to determine all aspects of this tripartite financial relationship.

## C. *Prior Proceedings*

Maintaining that it is not the hospital that should be left to absorb the difference between its non-Medicare billing rate and the amount Medicare would have paid, Vencor sued NSIC, alleging breach of contract and subrogation and seeking payment of $132,437.78, the difference between Vencor's billed charges and the amount it collected from NSIC. After discovery, the parties filed cross-motions for summary judgment.

The district court granted NSIC's motion for summary judgment, holding that no breach of contract occurred. The court ruled, first, that as a matter of Arizona's state contract and Medigap law, Rollins' Medigap policy obligated NSIC to pay for Rollins' hospitalization charges at the same rate that Medicare would have been required to pay to cover those charges had Rollins not exhausted his Medicare coverage. Second, the district court indicated that the Arizona state regulation governing Medigap insurance, *see* Ariz. Admin. Code § R20–6–1105(C), limits what a hospital can collect from patients who are covered by privately issued Medigap insurance policies.

Following an appeal to this court and a subsequent remand, the district court entertained Vencor's motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60. The district court denied the motion, declining to consider, as not new evidence, documents offered by Vencor as demonstrating that Arizona did not

intend to restrict what hospitals could charge under Medigap policies.[11]

The court noted, however, that even if it had incorrectly ruled in its original decision that Vencor could not charge more than the discounted Medicare rate under Rollins' Medigap policy, a reversal on this point would not alter its final judgment:

> [W]hether or not providers are allowed to charge rates above those established by the Medicare [Act] does not change the Court's disposition of the ultimate question whether the Medigap policy at issue obligated Defendant to pay Plaintiff at the rates higher than the Medicare rates.... Whether federal and/or state legislative history lends support to the Court's finding that the legislative intent was to limit the rates to those approved by Medicare does not change the Court's interpretation of the policy at issue under the Arizona law.

On appeal, Vencor challenges the district court's interpretation of Rollins' Medigap policy. It also maintains that we cannot decide this case without determining whether the Arizona Medigap regulation limits what Vencor can charge for services to patients who have exhausted their Medicare coverage and challenges the district court's original conclusion that Arizona law does incorporate such a limit.

## II. DISCUSSION

As is true of many puzzles, how one solves the conundrum presented by the intersection of state and federal Medigap regulation, on the one hand, and the competing interests of NSIC, Vencor, and Vencor's customers, on the other, may depend largely on where one starts. As judges, however, we are not free to choose

---

**11.** Fed.R.Civ.P. 60(b)(2) states that the court may relieve a party from a final judgment, order, or proceeding based on: "(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)."

either our starting or our ending place. Rather, we must start with the precise case before us—a dispute between an insurance company and its beneficiary's assignee regarding what benefits the policy obligates the insurer to pay. Once we resolve that dispute, we have completed our task. As will appear, we can do so without setting out all the rights and responsibilities of the affected parties and therefore leave full solution of this regulatory and legislative puzzle for another day.

## A. The Policy

 Despite the heavy overlay of federal and state Medigap insurance regulation, our basic job here is to interpret the insurance policy that established the scope of Rollins' Medigap coverage. We conclude that, read as a whole, the insurance policy provided by NSIC unambiguously states that NSIC will cover the costs of post-exhaustion hospital expenses at the same rate as Medicare would have covered these costs. *See Security Ins. Co. of Hartford v. Andersen,* 158 Ariz. 426, 763 P.2d 246, 248 (1988) (when an insurance policy is clear, a court may not invent ambiguity).

To repeat, the entire hospitalization coverage provision of the policy reads:

HOSPITAL BENEFIT–We will provide:

(a) Coverage of Part A Medicare-eligible expense for hospital confinement to the extent not covered by Medicare, from the 61st day through the 90th day in any Medicare benefit period.

(b) Coverage of Part A Medicare-eligible expense for hospital confinement to the extent not covered by Medicare for each Medicare lifetime inpatient reserve day used.

(c) Upon exhaustion of the Medicare hospital inpatient coverage including the lifetime reserve days, coverage of the Medicare Part A eligible expenses for hospital confinement to the same extent as would have been covered by Medicare, subject to a lifetime maximum benefit of an additional 365 days.

Reading all three of these coverage provisions together, as we must, demonstrates that the "to the extent ... covered" language in the contract refers to the dollar amount that Medicare pays for the same services. *See State Farm Mutual Automobile Ins. Co. v. Arrington,* 192 Ariz. 255, 963 P.2d 334, 338 (1998)(*citing Nichols v. State Farm Fire & Cas. Co.,* 175 Ariz. 354, 857 P.2d 406, 408 (1993) (requiring courts to read the contract as a whole to give a reasonable and harmonious effect to all provisions)).

Hospitalization coverage provisions (a) and (b) use the term "Part A Medicare-eligible expense." In each case, the provision then goes on to say that coverage is "to the extent not covered by Medicare," plainly referring to an amount of money for the eligible service that Medicare will not pay and that the insurance policy will pay instead. Just as "to the extent not covered by Medicare" in (a) and (b) refers to cost—amounts *not* reimbursed by Medicare, so too must "to the extent as would have been covered by Medicare" refer to the dollar amount Medicare *would* pay if coverage had not been exhausted.[12]

This conclusion is further supported by breaking coverage grant (c) into two parts: (1) "Medicare Part A eligible expenses for hospital confinement;" and (2) "to the same extent as would have been covered by Medicare." Vencor maintains that the second part of the provision means the "sort" of services covered by Medicare. But the policy, as required by law, defines "Medicare-eligible expense" to mean "expense of

---

12. We cannot imagine any meaningful difference between "Part A Medicare-eligible expense" and "Medicare Part A eligible expense." Instead, the difference is probably best attributed to a proofreader's failure to catch the inconsistency.

the kind covered by Medicare, to the extent recognized as reasonable and medically necessary by Medicare."[13] This phrase directly refers to the *sort* of expenses that Medicare would cover. Thus, if Vencor's argument regarding the second phrase is correct, then each part of the provision means the same thing: The policy would cover the sort of services Medicare covers to the extent that they are the sort of services that Medicare covers. On the other hand, if the second part of the provision refers, as NSIC contends, to the Medicare rate, then the coverage grant makes sense: it covers the sort of services covered by Medicare up to the amount that Medicare would have paid for them.

We therefore conclude that, reading only the language of the NSIC insurance policy, the coverage provisions obligated NSIC to reimburse Vencor only at the rate Medicare would have paid.[14]

## B. Considerations External to the Policy

There are, however, two considerations external to the four corners of the policy

that Vencor maintains require us to interpret the policy otherwise:

### 1. Provisions Mandated by Law

■ The first such consideration we are asked to examine is the principle of Arizona law specifying that even if an insurance policy does not contain a certain coverage provision, that provision is added to the policy if it is mandated by law.[15] *Insurance Co. of North America v. Superior Court*, 166 Ariz. 82, 800 P.2d 585, 588 (1990). Vencor's contention is that part of the Arizona Medigap regulation requires coverage of any amount the hospital chooses to bill.

The Arizona regulation to which Vencor ascribes this meaning is the one that requires insurers to offer the following post-exhaustion hospitalization core benefit:

Upon exhaustion of the Medicare hospital inpatient coverage including the lifetime reserve days, coverage of the Medicare Part A-eligible expenses for hospitalization paid at the [DRG] day outlier per diem or other appropriate

---

13. The policy also includes a "definition" for "Expense" as an "expense you incur for necessary medical services or supplies prescribed by a doctor." The parties dispute whether this definition uses the term "expense" to mean a "cost" or a "service." The "definition" does not, however, illuminate which meaning of "expense" was intended in the policy as a whole. Instead, the purported definition tautologically defines an "expense" as a certain kind of "expense." As such, the "definition" is really just a limitation, indicating that some kinds of expenses are intended to be included and others not, and is of little aid in determining the sense in which the policy uses the term "expense."

14. Other cases have interpreted similar or identical policy provisions to require reimbursement at the Medicare rate. *Vencor Hospitals South, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 86 F.Supp.2d 1155, 1159–60 (S.D.Fla.2000), *aff'd*, 284 F.3d 1174 (11th Cir. 2002) ("Medicare Part A Eligible Expenses"

refers to amounts of expenses, not just types of services, that would be eligible for payment under Medicare); *Vencor, Inc. v. Standard Life and Accident Ins. Co.*, 65 F.Supp.2d 573, 579 (W.D.Ky.1999) (policy provides for reimbursement at the Medicare per diem rate). *But see Vencor Hospitals South, Inc. v. National States Ins. Co.*, No. 94–CV–894, 1995 U.S. Dist. LEXIS 21544, at *11–13, 1995 WL 1939110 (M.D. Fla. June 22, 1995) (finding contract terms ambiguous and interpreting them in favor of the insured to include payment of the provider's full-billed charges), *aff'd without opinion*, 120 F.3d 274 (11th Cir. 1997).

15. Consistent with this principle of Arizona contract law, NSIC's policy contains a provision entitled "Conformity with State Statutes" that states: "Any provision of this policy which, on its effective date, is in conflict with the laws of the state in which you reside on that date is amended to conform to the minimum requirements of such laws."

standard of payment, subject to a lifetime maximum benefit of an additional 365 days . . . .

Ariz. Admin. Code § R20–6–1105(C)(3) ("appropriate standard regulation"). This language differs from the coverage provision in NSIC's policy, which, once again, states that the insurer will provide "coverage of the Medicare Part A-eligible expenses for hospital confinement to the same extent as would have been covered by Medicare." But the rule requiring the importation of mandatory coverage provisions into insurance policies has no application here, because the *substance* of the regulation's requirement and of the policy provision is the same.

The DRG payment standard mentioned in the appropriate standard regulation refers to the manner in which Medicare reimburses some hospitals, namely at a predetermined rate based upon the "diagnostic related group" classification of the patient's illness at the time of admission.[16] *See* n. 5, *supra;* 42 U.S.C. § 1395ww(d). The DRG coverage standard does not apply to care provided by Vencor and other PPS-exempt hospitals. *See* 42 C.F.R. § 412.23(e). Instead, Vencor and other long-term acute care hospitals are reimbursed according to a "reasonable cost" reimbursement system at a per diem rate for each day that a patient is hospitalized. 42 U.S.C. §§ 1395f(b)(1), 1395x(v); 42 C.F.R. § 412.22(b) & pt. 413.

Because the DRG standard of payment refers to one of the two typical Medicare reimbursement formulas for hospitals, under the maxim of *ejusdem generis,* it follows that "other appropriate standard of payment" refers to the other Medicare reimbursement formula—in this case, the per diem rate for PPS—exempt hospitals.

*See Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 114–15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) ("Under this rule of construction the residual clause should be read to give effect to the [preceding terms], and should itself be controlled and defined by reference to the enumerated categories . . . which are recited just before it . . . ."); *Norfolk & Western Rwy. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) ("Under the principle *ejusdem generis,* when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.").

Bolstering this conclusion is an Arizona regulation that prohibits Medigap insurers from providing "for the payment of benefits based on standards described as 'usual and customary,' 'reasonable and customary' or words of similar import." Ariz. Admin. Code § R20–6–1113(A)(3). For the purposes of reimbursement of PPS-exempt hospitals, federal Medigap regulations define "customary charges" as "the regular rates that providers charge both beneficiaries and other paying patients for the services furnished to them." 42 C.F.R. § 413.13(a). The federal regulations also provide criteria for determining whether a charge is "reasonable." 42 C.F.R. § 405.502 (listing standards including "the customary charges for similar services generally made by the physician or other person furnishing such services" and "the prevailing charges in the locality for similar services").

This additional restriction on what Medigap policies can provide affirms that "other appropriate standard of payment" 13211 cannot refer to the amount a Medicare provider chooses to bill. If vague billing

---

16. PPS providers may receive additional reimbursement for hospitalizations with unusually long lengths of stay or high costs—that is "outlier" cases. 42 U.S.C. § 1395ww(d)(5)(A)(i); C.F.R. § 412.80 *et seq.*

terms like "customary" cannot be used to signify the provider's self-defined rates, no other terms are provided, and the language indicates that there does exist an "appropriate *standard*," (emphasis added), then the necessary implication is that *some* external governing standard, not just the size of the provider's bill, delimits the obligations of the policy. The obvious applicable standard, parallel to the DRG rate specifically mentioned, is the appropriate Medicare rate—in this case, the per diem rate Medicare was paying before Rollins exhausted his hospitalization coverage. And that rate, multiplied by the number of days Rollins stayed in the hospital after his coverage had expired, is the exact amount which NSIC has already paid Vencor.

The upshot is that the Arizona regulations require Medigap coverage at the same reimbursement rate that Medicare uses. That is exactly what the NSIC policy provides. Arizona Medigap regulations therefore do not alter the unambiguous terms of NSIC's insurance contract with Rollins.

### 2. *Outline of Coverage*

Vencor suggests, however, that the contents of the insurance policy and the Arizona regulations are not the end of the story and asks us to take the prescribed Outline of Coverage into account as well. ▮▮▮ Although the actual insurance contract does not contain any promises regarding *Rollins'* possible expenses, the Outline does: The Outline informed Rollins that he would pay "$0" for up to 365

days of post-exhaustion hospital care and that NSIC would pay "100% of Medicare Eligible Expenses." That provision of the Outline, Vencor argues, should be understood as incorporated into the policy and necessitates that the policy proper cannot be read to mean what its plain terms would otherwise import.

An insurer, it is true, cannot both promise that it will pay only part of an insured's billed costs and still promise that the insured will pay nothing, unless the provider has agreed to accept the insurer's partial payment as payment in full—and Vencor insists that there is no such agreement, explicit or implicit. Whether this riddle posed by the Outline of Coverage is relevant to the narrow problem before us depends on whether the Outline could modify the otherwise clear language of the insurance policy. It cannot. Instead, the policy must be read independently of the Outline for three reasons: the Outline itself supports that conclusion; the regulations mandating distribution of the Outline support that conclusion; and the reasonable expectations doctrine does not apply in this context to hold NSIC liable for the representations of the Outline.[17]

First, the Outline itself makes clear that it should not be construed as part of the insurance policy. On the second page of the Outline, a message in large type warns: "READ YOUR POLICY VERY CAREFULLY." Beneath this warning a message in standard sized type states: "This is only an outline, describing your policy's most important features. The policy is your insurance contract. You must

---

17. In two similar cases, courts have determined that the Outline of Coverage was not part of the Medigap policy. *Blue Cross & Blue Shield*, 86 F.Supp.2d at 1159–60(finding that the Outline is not part of the insurance contract because Florida's regulatory scheme requires an explicit statement to that effect and the Outline itself states the same); *Stan-*

*dard Life & Accident*, 65 F.Supp.2d at 578–79 (finding Outline not to be part of the insurance contract where the Outline itself states that the contract governs, and Tennessee law requires such a statement). Neither case addressed the discrete reasonable expectations doctrine, as neither Florida nor Tennessee recognizes the doctrine.

read the policy to understand all of the rights and duties of both you and your insurance company." "It would be non-sensical to consider the Outline to be a part of the contract when on its face and in a very conspicuous manner it declares that it is not." *Blue Cross & Blue Shield*, 86 F.Supp.2d at 1159.

Second, the very regulation that mandates distribution of the Outline requires that the Outline contain this clear and conspicuous language stating that it is not part of the policy, that the terms are dictated by the policy, and that the insured should read the policy very carefully. Thus, the language of the regulation establishes that requiring distribution of the Outline was not intended to make the Outline part of the policy.

 Third, the reasonable expectations doctrine does not require us to hold NSIC liable for the full costs Vencor incurred in providing Rollins' care. This important consumer-protection doctrine of Arizona insurance law (and the insurance law of many other states, *see* Ostrager & Newman, *Handbook on Insurance Coverage Disputes*, § 1.03(b)(2)(B) (9th ed. 1998)) protects individuals from over-reaching by insurance companies by "hold[ing] the drafter to good faith and terms which are conscionable." *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 682 P.2d 388, 399 (1984). The doctrine, essentially a relaxation of the rule barring parol evidence from being admitted to discern the intent of the parties to a contract, *see id.* at 400–01, can override even unambiguous contract provisions when an insured reasonably expected the provision to operate differently. *Gordinier v. Aetna Casualty & Surety Co.*, 154 Ariz. 266, 742 P.2d 277, 283 (1987).

Vencor argues that, under the reasonable expectations doctrine, even if the Outline is not considered part of the policy, its representations still require NSIC to cover the full-billed charges for Rollins' hospitalization. We disagree.

As an initial matter, we note that the only way the reasonable expectations doctrine could alter the terms of the policy is if Vencor is permitted to bill Rollins at a rate higher than the Medicare rate. If Vencor cannot legally charge Medicare patients who have exhausted their Medicare coverage a rate in excess of the Medicare rate, then any reasonable expectation created by the Outline would be entirely consistent with the unambiguous coverage terms of the policy: NSIC's policy covers Rollins' expenses to the same extent as Medicare, and Rollins is left owing $0, as the Outline states. If, on the other hand, Vencor can charge its actual-billed rates to Rollins and other Medigap-insured patients who have exhausted their Medicare coverage, then our conclusion that NSIC is liable only for what Medicare would have paid creates a result seemingly contrary to the Outline dictated by the Medigap regulations: Vencor could "balance bill" the patients for the difference, leaving Rollins and other Medicare patients with substantial uninsured costs.

Vencor's understanding of its billing rights under the Medigap regulations is quite debatable. Another Court of Appeals has characterized the issue as one of whether the regulations impose "price controls." *Vencor, Inc. v. Physicians Mutual Ins. Co.*, 211 F.3d 1323, 1325–26 (D.C.Cir. 2000). But, the issue is more properly understood, perhaps, as one of whether the promise medical care providers make in order to be reimbursed by Medicare under 42 U.S.C. § 1395cc(a)(1)(A)(i) not to bill covered individuals with regard to "items or services for which such individual is entitled to have payment made under this subchapter" carries over to reimbursement for the same items or services under Medi-

gap insurance policies, whose terms are dictated by the 1991 NAIC Model Regulation directly incorporated in the same subchapter.[18] *Id.*

That the Medigap insurance regulations were drafted against background understandings that there is such a continuing agreement, that Medigap insurance is intended to provide covered patients with the same protection they enjoyed under Medicare, and that medical providers therefore may not balance bill patients covered by Medigap policies, seems quite possible. Otherwise, the representations made in the Outline would make little sense. So, another way of looking at the same question would be to ask whether the state and federal Medigap statutes and regulations, including—because it is explicitly incorporated into those statutes and regulations—the 1991 NAIC Model Regulation, give rise to an implicit agreement by medical providers, when they accept payment through Medigap insurance, to charge the Medicare rates with regard to items and services covered by that insurance.

At the same time, it is curious indeed that such an important matter as the billing rate of medical providers for medical services covered by Medigap policies is left to interpretation, implication, or inference, even informed inference, rather than made explicit. One is left with the sense that, as is sometimes the case, a critical aspect of the contractual and regulatory scheme was left unstated precisely because it was so much a bedrock premise of the involved parties that the need for articulation escaped drafters.[19] Such lapses of attention are unfortunate, as affected parties and courts are then left to trace the interpretive threads left behind.

We need not trace those threads to their ultimate destination in this case, however. The only issue before us is the amount Vencor, as the assignee of Rollins' benefits, may collect from NSIC. As no question

18. There is no explicit answer to this question in the federal regulations. 42 C.F.R. § 412.42(e) does state that "[t]he hospital may charge the beneficiary its customary charges for noncovered items and services furnished on outlier days ... for which payment is denied because the beneficiary is not entitled to Medicare Part A or his or her Medicare Part A benefits are exhausted." 42 C.F.R. § 412.42(e). This regulation, however, pertains only to PPS hospitals and, in any event, does not address the question whether the permission carries over to items and services covered by a Medigap policy.

19. The NAIC has drafted an amendment to the Model Regulation that would clarify the issue. The amendment would add a sentence to the end of the description of the core benefit package's post-exhaustion hospitalization provision stating that: "The provider must accept the issuer's payment as payment in full and may not bill the insured for any balance." A proposed drafting note following that provision would explain that:

the issuer is required to pay whatever amount Medicare would have paid as if Medicare was covering the hospitalization. The "or other appropriate standard of payment" provision means that if Medicare would have made cost-outlier, DRG, or[non-PPS] reasonable cost payments instead of day outlier payments, then that other type of payment is the other appropriate standard of payment.

Amendments to the Model Regulation to Implement the NAIC Medicare Supplement Insurance Minimum Standards Model Act, at 5 (drafted Aug. 17, 1998). The amendment also requires that the following statement be included in the Outline:

When your Medicare Part A hospital benefits are exhausted, the insurer stands in the place of Medicare and will pay whatever amount Medicare would have paid for up to an additional 365 days.... During this time the hospital is prohibited from billing you for the balance based on any difference between its billed charges and the amount Medicare would have paid.

*Id.* at 13. Neither HCFA nor its successor agency, the Center for Medicare and Medicaid Services, has adopted the proposed NAIC Amendment.

concerning the amount Vencor may collect from Rollins' estate is directly before us, we should shy from answering that question unless we have to.[20] *Blue Cross & Blue Shield*, 284 F.3d at 1175(declining, in a case similar to this one, to address the balance billing issue because it is "an issue to be resolved, either amicably or in litigation, between Vencor and the respective insureds"). And, for the reasons that follow, we conclude that, even if Vencor were right about its balance billing option, the reasonable expectations doctrine would not apply in this unusual insurance situation—unusual because so tightly overseen by federal and state regulation as to leave the insurer with little independent role in delineating the policy's terms.

■ The reasonable expectations doctrine at its inception was intended largely to regulate overreaching by vendors and insurance companies who make oral or written representations that mislead potential purchasers. Robert E. Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv. L. Rev. 961, 963–65 (1970); *see also Darner*, 682 P.2d at 395–96. It does not apply to *any* circumstance in which an insurance policy is inconsistent with some other information an insured obtains concerning the coverage offered by that policy but only to those situations that come within the purposes of the doctrine.

*Gordinier* lists "a limited variety of situations" in which Arizona courts will apply the reasonable expectations doctrine to defeat unambiguous boilerplate insurance terms:

1. Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the objective, reasonable expectations of the average insured;

2. Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage;

3. Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured;

4. Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy.

742 P.2d at 283–84 (citations and quotations omitted). *See also Philadelphia Indem. Ins. Co. v. Barerra*, 200 Ariz. 9, 21 P.3d 395, 403 (2001) ("In *Gordinier*, we confirmed that the *Darner* methodology applies to a limited number of cases in which the boilerplate contract clauses are unambiguous but still operate oppressively."). This case involves none of the four circumstances described in *Gordinier*.

The coverage provision of the NSIC policy is not worded in such a way that the reasonably intelligent consumer could not understand it as reaching the amount of money that Medicare would pay for the same items and services. There is nothing particularly arcane or technical about the

---

**20.** We are particularly reluctant to decide this issue in a case in which a hospital is standing in the shoes of one of its patients, given the inherent conflict between the interests of the hospital and of affected patients: Vencor prefers that there be no limit on what it can charge patients. In contrast, Rollins' long run interest, were he still alive, would have been in arguing that Vencor cannot charge more than the Medicare rate. If Vencor can charge Medigap insureds its actual-billed charges, those patients will likely end up paying more for their future hospital care, whether they have to pay the full amount directly or absorb some of the costs indirectly through higher Medigap premiums.

pertinent language. Nor is there any evidence that Rollins did not receive full and adequate notice of the coverage terms of his insurance contract with NSIC. The pertinent language is contained in precisely the location where one would look for it, the basic coverage provision, not in a definitional section, small print addenda, or other out-of-the-way part of the policy. There is no suggestion that Rollins was not provided with the policy or could not, for some reason personal to him, understand it.

The third and fourth situations to which the reasonable expectations doctrine applies under *Gordinier* require "some activity which can be reasonably attributed to the insurer." 742 P.2d at 284. NSIC did not choose the language of the Outline or circulate the Outline for promotional purposes. Rather, state law mandated the relevant language of the Outline and required that insurers distribute the Outline of Coverage along with any Medigap policy. Ariz. Admin. Code § R20–6–1113(C). Furthermore, state law mandated the level at which NSIC could cover Rollins' hospitalization costs. *Id.* § R20–6–1105(C). *Cf. Philadelphia Indemnity*, 21 P.3d at 404 (holding an insurance company liable for an accident clearly outside the protection of the policy's actual terms but that could reasonably have been expected to be covered based on a promotional brochure drafted and distributed by the insurer). If Medigap-covered patients are being misled—and, as suggested above, it is far from clear that they are, as it is doubtful that Vencor and other hospitals may, balance bill them—the cause is not "some activity which can be reasonably attributed to the insurer," but confusion created by the federal and state statutes and regulations.

A related principle of Arizona contract law confirms that the reasonable expectations doctrine cannot alter the coverage conclusion we reached by reading the policy. Under Arizona contract law, courts "interpret insurance agreements 'in light of *controlling* contract law or ... statutes'." *Hill v. Chubb Life American Ins. Co.*, 182 Ariz. 158, 894 P.2d 701, 707 (1995) (emphasis added). Because Arizona regulations control the terms of the policy by requiring NSIC to provide reimbursement at the Medicare-discounted rate and NSIC did just that, it should not now be held liable for charges that exceed this rate.

True, NSIC included the Outline of Coverage when it provided Rollins with the policy because a state regulation required it to do so. *See* Ariz. Admin. Code § R20–6–1113(C). If NSIC had not provided for coverage at the rate Medicare would have paid, *or* if it had not distributed an Outline of Coverage stating that the insured pays nothing, it would have faced possible civil and criminal penalties. 42 U.S.C. § 1395ss(p)(8)-(9). Under these circumstances, it makes more sense to read the policy in accordance with the state regulations that directly control the policy than to hold NSIC liable for any consumer expectation created by another state law requirement that does not govern the policy itself.

NSIC's distribution of the Outline therefore does not alter our conclusion that NSIC's policy with Rollins provides for insurance coverage of Rollins' post-exhaustion hospitalization at the rate that Medicare would have paid. Thus, NSIC owes Rollins only $38,760—the precise amount that NSIC has already paid and Vencor has already received for Rollins' hospitalization after March 3, 1994.[21] As subro-

21. In determining the proper amount of NSIC's liability, we assume without deciding—because the parties do not argue otherwise—that the per diem rate, multiplied by the number of post-exhaustion medical care

gee/assignee of any benefits that NSIC owes Rollins under the policy, Vencor can collect no more than the $38,760 that NSIC is liable for under the insurance policy.

## CONCLUSION

According to the unambiguous terms of the policy it issued to Rollins, NSIC is obligated to pay Vencor the amount that Medicare would have paid. Arizona regulations, following parallel federal regulations, required NSIC to write an insurance policy that provided for hospitalization coverage at discounted Medicare rates. NSIC followed this regulation, set its premiums accordingly, and abided by the terms of the policy. It cannot now be held in breach of its insurance contract. We therefore AFFIRM the district court's grant of summary judgment in favor of NSIC.

AFFIRMED.

SNEED, Circuit Judge, Concurring.

Judge Sneed concurs in the result and in parts I and II(A) of the opinion. He does not concur in the remainder of the opinion, which he considers unnecessary to the result.

days, is the amount that Medicare would have paid for Rollins' care. We recognize that in the usual case, this figure is subject to such

end-of-year adjustments as are appropriate to arrive at the Medicare rate.